Record No. 14-2032
_____

IN THE

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT
_____

PEABODY HOLDING COMPANY, LLC
AND
BLACK BEAUTY COAL COMPANY, LLC, now known as
Peabody Midwest Mining, LLC

*Plaintiffs-Appellants,*

v.

UNITED MINE WORKERS OF AMERICA
INTERNATIONAL UNION,

*Defendant-Appellee,*
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT ALEXANDRIA
_____

**BRIEF OF APPELLANTS**
_____

John R. Woodrum
W. Gregory Mott
Zachary S. Stinson
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
 1909 K Street, Suite 1000
Washington, D.C.  20006
202-887-0855

*Counsel for Plaintiffs-Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-2032__    Caption: Peabody Holding Company, LLC, et al. v.
                            United Mine Workers of America, Int'l Union

Pursuant to FRAP 26.1 and Local Rule 26.1,

Peabody Holding Company, LLC
(name of party/amicus)

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                          ☑ YES ☐ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

      Appellant is a subsidiary of Peabody Investments Corp., which is a subsidiary of Peabody Energy Corporation

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                              ☑ YES ☐ NO
      If yes, identify all such owners:

      Peabody Energy Corporation

10/28/2013 SCC                              - 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ John R. Woodrum          Date:    October 23, 2014

Counsel for: Peabody Holding Company, LLC

## CERTIFICATE OF SERVICE
*****************************

I certify that on    October 23, 2014    the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Diana Migliaccio Bardes
John R. Mooney
Mooney, Green, Saindon, Murphy & Welch, P.C.
Suite 400
1920 L Street, N.W.
Washington, D.C.  20036

/s/ John R. Woodrum                          October 23, 2014
_____                  _____
(signature)                                          (date)

- 2 -

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-2032__        Caption: __Peabody Holding Company, LLC et al. v.__
United Mine Workers of America, Int'l Union

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Peabody Midwest Mining Company, LLC (f/k/a Black Beauty Coal Co., LLC)__
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?  ☑ YES ☐ NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

    Appellant is a subsidiary of Peabody Midwest Operations, LLC which is a subsidiary of Peabody Operations Holding, LLC, which is a subsidiary of Peabody Investments Corp., which is a subsidiary of Peabody Energy Corporation.

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☑ YES ☐ NO
    If yes, identify all such owners:

    Peabody Energy Corporation

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                         ☐ YES ☑NO
     If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ John R. Woodrum _____        Date: ____October 23, 2014____

Counsel for: Peabody Midwest Mining Co., LLC _____
                (f/k/a Black Beauty Coal Co., LLC)

## CERTIFICATE OF SERVICE
*****************************

I certify that on ____October 23, 2014____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Diana Migliaccio Bardes
John R. Mooney
Mooney, Green, Saindon, Murphy & Welch, P.C.
Suite 400
1920 L Street, N.W.
Washington, D.C.  20036

/s/ John R. Woodrum _____            ____October 23, 2014____
        (signature)                                    (date)

# <u>TABLE OF CONTENTS</u>

**PAGE**

I.  STATEMENT OF SUBJECT MATTER
    AND APPELLATE JURISDICTION ................................................. 1

II.  STATEMENT OF THE ISSUE ..................................................... 1

III.  STATEMENT OF THE CASE ..................................................... 2

IV.  STATEMENT OF THE FACTS ................................................... 5

V.  SUMMARY OF ARGUMENT................................................... 9

VI.  STANDARD OF REVIEW .................................................... 13

VII.  ARGUMENT ................................................................14

    A.  Enforcement of the Jobs MOU Violates
    Sections 8(b)(4) and 8(e) of the National
    Labor Relations Act …………………………………………..14

        1.  The Genesis of the Jobs MOU Confirms
        that its Hiring Obligations are Anchored
        exclusively to the Existence of
        Double-Breasted Mining Operations ……………………15

        2.  The Only Federal Court Case to Decide
        a NLRB Section 8 Challenge to the Jobs
        MOU Confirms that Common Ownership
        is the Linchpin to Enforcement  …………………………21

        3.  The Arbitrator's Construction of the Jobs
        MOU Violates Sections 8(b)(4) and 8(e) of the
        NLRA as Applied to Appellants …………………………23

i

a. The Union Cannot Satisfy the Right of
   Control Test ……………………………………..25

b. The District Court Misapplied the Right
   to Control Test when it Found Appellants
   Are Not Neutral ………………………………………29

c. Enforcing the Arbitration Decision Does
   Not Preserve the Work of Heritage Coal's ……….. .34
   Bargaining Unit.

B.    Forcing Appellants to Provide Hiring Preferences
      Based On Union Membership Violates Section
      8(b)(1)(A) And 8(b)(2) of The NLRA ……………………40

C.    The Arbitrator's Finding that Appellants'
      Obligations Under the 2007 Jobs MOU Survived
      The July 1, 2011 Termination of The 2007 CBA
      Does Not Draw Its Essence From the Agreement…………46

VIII.   CONCLUSION ……………………………………………50

IX.     REQUEST FOR ORAL ARGUMENT ………………………..51

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Becker Elec. Co. v. Int'l Bhd. of Elec. Workers, Local Union No. 212*,
    927 F.2d 895 (6th Cir. 1991) .................................................. 36, 37

*Courier-Citizen Co. v. Boston Electrotypers Union No. 11, Int'l
    Printing & Graphic Commc'ns Union of N. America*,
    702 F.2d 273 (1st Cir. 1983) ........................................................44

*Coward v. Jabe*, 474 F. App'x 961 (4th Cir. 2012), *vacated and remanded
    by* 532 F. App'x 328 (4th Cir. 2013)…………………………….... 13, 33

*Directors Guild of America, Inc. (Ass'n of Motion Picture & Television
    Producers, Inc.)*, 198 NLRB 707 (1972), *enf.,* 494 F.2d 692
    (9th Cir. 1974), *review denied, enforcement granted sub nom*.
    *Security Bureau, Inc. v. NLRB*, 926 F.2d 1215 (D.C. Cir. 1991)........... 41, 42

*Electronics Corp. of America v. Int'l Union of Electrical, Radio and Machine
    Workers,* 492 F.2d 1255 (1st Cir. 1974)................................................50

*George Koch Sons, Inc. v. NLRB*, 490 F.2d 323 (4th Cir. 1973)............................31

*IATSE, Local 659 (MPO-TV of California)*, 197 NLRB 1187 (1972),
    *enf.,* 477 F.2d 450 (D.C. Cir. 1973)................................................ 41, 42, 43

*In'tl Ass'n of Bridge Structural and Ornamental Iron Workers,*
    328 NLRB 934 (1999)................................................................20

*International Longshoremen Local No. 1410 (E. Harris Mercer & Mobile
    Steamship Ass'n Inc.*, 235 NLRB 172 (1978) ........................................ 23, 24

*Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982)................................................13

*KenAmerican Resources, Inc. v. Int'l Union, UMWA*,
    No. 95-2252, 1996 WL 251859 (D.D.C. May 8, 1996),
    *rev'd on other grounds*, 99 F.3d 1161 (D.C. Cir. 1996) ...... 17, 21, 22, 23, 43

iii

*Local 917, Int'l Bhd. of Teamsters v. NLRB*, 577 F.3d 70 (2d Cir. 2009)........ 30, 31

*Lone Star Steel Co. v. NLRB*, 639 F.2d 545 (10th Cir. 1981)...................................38

*Mountaineer Gas Co.  v. Oil, Chem. & Atomic Workers Int'l Union*,
    76 F.3d 606 (4th Cir. 1996) .................................................................... 13, 50

*Marrowbone Dev. Co. v. Dist. 17, UMWA*, 147 F.3d 296 (4th Cir. 1998) ..…...14, 37

*National Post Office Mailhandlers v. United States Postal Serv.*,
    751 F.2d 834 (6th Cir. 1985) ...........................................................................50

*National Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612 (1967) .............. 15, 26, 34

*New York Typographical Union No. 6*, 242 NLRB 378 (1979),
    *enforcement granted in part, denied in part*,
    632 F.2d 1971 (2d Cir. 1981) .........................................................................41

*NLRB v. Enterprise Ass'n of Steam, Hot Water, Hydraulic Sprinkler,*
    *Pneumatic Tube, Ice Machine, and General Pipefitters of*
    *New York and Vicinity, Local Union No. 638*,
    429 U.S. 507 (1977)....................................................................... 25, 31, 35

*NLRB v. Int'l Longshoremen's Ass'n* ("*ILA I*"),
    447 U.S. 490 (1980)............................................................ 15, 24, 25, 26, 37

*NLRB v. Int'l Longshoremen's Ass'n* ("*ILA II*"), 473 U.S. 61 (1985)........ 15, 24, 25

*Northeast Ohio District Council of the United Brotherhood of*
    *Carpenters and Joiners of America*, 310 NLRB 1023 (1993) .....................21

*Pacific Northwest Chapter of the Associated Builders and*
    *Contractors, Inc. v. NLRB*, 654 F.2d 130 (9th Cir. 1981),
    *aff'd in part, vacated in part, Woelke & Romero*
    *Framing, Inc. v. NLRB*, 456 U.S. 645 (1982).................................................39

*Painters Dist. Council No. 20 (Uni-Coat)*, 185 NLRB 930 (1970)........................32

*Peabody Holding Co. v. United Mine Workers of Am., Int'l Union,*
   Case No. 1:09-cv-1043, 2010 WL 356274 (E.D. Va. Sept. 7, 2010) ......... 3

*Peabody Holding Co. v. United Mine Workers of Am., Int'l Union,*
   665 F.3d 96 (4th Cir. 2012)……………………………………...... 4, 46

*Peabody Holding Co. v. United Mine Workers of Am., Int'l Union,*
   41 Supp. 3d 494 (E.D. Va. 2014) …………………………………… 1

*PBM Products, LLC v. Mead Johnson & Co.*, 639 F.3d 111 (4th Cir. 2011) ... 13, 33

*Road Sprinkler Fitter, United Ass'n of Journeymn and Apprentices*
   *of the Plumbing and Pipe Fitting Industry of the U.S. and Canada*
   *Local Union No. 669,* 357 NLRB  No. 176 (2011) .......................... 26, 27, 28

*Sheet Metal Workers, Local Union No. 91 v. NLRB,*
   905 F.2d 417 (D.C. Cir. 1990)....................................................................23

*Teamsters Freight Local No. 480*, 167 NLRB 920 (1967),
    *enforced,* 409 F.2d 610 (6th Cir. 1969).......................................................42

*Teamsters Local 600 (TNT Holland Motor Express)*,
   24 NLRB Advice Mem. Rep. ¶ 34025 (LRP Publ'ns) (1994).......... 41, 42, 43

*Teamsters Local Union No. 523 v. NLRB*, 590 F.3d 849 (10th Cir. 2009) ..............43

*United States Postal Serv. v. American Postal Workers Union*,
   204 F.3d 523 (4th Cir. 2000) .......................................................................49

*United Telegraph Workers v. NLRB*, 571 F.2d 665 (D.C. Cir),
   *cert. denied*, 439 U.S. 827 (1978) ...............................................................21

## Statutes

28 U.S.C. § 1291 ...............................................................................................1
28 U.S.C. § 1331 ...............................................................................................1
29 U.S.C. § 157 ...............................................................................................40
29 U.S.C. § 158 ............................................................................... 14, 21, 22, 29

29 U.S.C. § 185(a) ............................................................................1
29 U.S.C. § 158(a)(3)........................................................................41
29 U.S.C. § 158(b) ..…………………………………………………1, 3, 12
29 U.S.C. §§ 158(b)(1)................................................................ 11, 44
29 U.S.C. § 158(b)(1)(A) …………………………………………40, 41, 42
29 U.S.C. § 158(b)(2) ……………………..……………11, 40, 41, 42, 43, 44
29 U.S.C. § 158(b)(4)  …………………………………………………14, 23, 41
29 U.S.C. § 158(b)(4)(ii)...................................................................23
29 U.S.C. § 158(e) ......... 1, 3, 9, 10, 11, 12, 13, 14, 15, 23, 24, 25, 26, 31, 34, 36, 37

## Other Authorities

Robert A. Gorman & Matthew W. Finkin, *Labor Law Unionization
    and Collective Bargaining*, at 359 (2d ed. 2004) …………………..25, 30

Edwin S. Hopson & George J. Miller, *The Impact of Article II
    of the National Bituminous Coal Wage Agreement of 1988
    on the Sale, Acquisition, and Operation of Coal Property*,
    11 E. Min. L. Found. § 8.03[1] (1990) ...........................................39

Daniel L. Stickler & Erin F. Magee, *The National Bituminous Coal
    Wage Agreement of 1993 and the Memorandum of
    Understanding Regarding Job Opportunities:  Is
    "Double Breasting" Dead*?,
    15 E. Min. L. Found. § 5.01 (1994)........................................ 15, 18, 20, 21

## Rules

Fed. R. Civ. P. 34(a).............................................................................51
Fed. R. Civ. P. 56 ................................................................................33
Local Rule 34(a)....................................................................................51

# I.    STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The district court had jurisdiction over Appellants' complaint seeking declaratory relief from the Job Monitor's ("Jobs Monitor" or "Arbitrator") January 18, 2013 merits ruling ("Arbitration Decision") pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 185(a).  The district court had jurisdiction over Appellee United Mine Workers of America's ("UMWA" or "Union") counterclaim to enforce the Arbitration Decision pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 185(a).

The district court denied Appellee's motion to dismiss, and Appellants' motion for summary judgment, but granted Appellee's motion for summary judgment in a reported Memorandum Opinion and Order entered August 28, 2014. J.A. 125-156. *Peabody Holding Co. v. United Mine Workers of Am., Int'l Union*, 41 F. Supp. 3d 494 (E.D. Va. 2014).  Appellants filed a timely Notice of Appeal on September 24, 2014.  J.A. 157.  As an appeal of a final decision, this Court's appellate jurisdiction rests on 28 U.S.C. § 1291.

# II.    STATEMENT OF THE ISSUES

1. Did the district court err when it found that Sections 8(b) and 8(e) of the National Labor Relations Act ("NLRA") do not bar judicial enforcement of an Arbitrator's Decision that requires a union-free employer to provide preferential job rights to the employees of an unrelated, unionized employer?

1

2. Did the district court err when it concluded that an Arbitration Decision drew its essence from the labor agreement where the agreement the Arbitrator relied on as the basis for his decision never existed?

## III.   STATEMENT OF THE CASE

More than a year after the corporate spinoff of Heritage Coal Co., LLC ("Heritage Coal"),  and in response to a new mining operation in Indiana initiated in 2008 by United Minerals, LLC ("United Minerals"), an independent contractor for Appellant Black Beauty Coal Company, LLC  ("Black Beauty"), the UMWA demanded, J.A. 36, that Black Beauty, and its direct parent company, Appellant Peabody Holding Company, LLC ("PHC"), offer jobs at the new operation to UMWA-represented employees of signatory Employer Heritage Coal pursuant to the terms of the 2007 Memorandum of Understanding Regarding Job Opportunities ("2007 Jobs MOU" or "Jobs MOU").  J.A. 76-81.

In view of the fact Heritage Coal (f/k/a Peabody Coal Company ("Peabody Coal")) had ceased to be part of Appellants' corporate family as of October 31, 2007, when it became a wholly owned subsidiary of publicly-traded Patriot Coal Corporation ("Patriot" or "Patriot Coal"), Appellants refused the UMWA's demands.[1]  On February 9, 2009, the Union invoked the Jobs MOU's grievance

---

[1] Peabody Coal and Heritage Coal are the same entity.  Peabody Coal was renamed Heritage Coal after it was spun off to Patriot Coal.  Appellants will refer to the entity as Peabody Coal with respect

machinery.  J.A. 36, 37; J.A. 79 at ¶14.  Appellants filed a declaratory judgment action, *Peabody Holding Co., LLC v. United Mine Workers of Am., Int'l Union*, No. 1:09-cv-1043 (E.D. Va.), seeking to have the effect of the Union's claim for post-divestiture enforcement of the Jobs MOU resolved at the outset by a federal court.  Appellants also sought a declaration that enforcement of the Jobs MOU in the absence of common ownership between Black Beauty and Heritage Coal violated Sections 8(b) and 8(e) of the NLRA, 29 U.S.C. § 158(b) and (e).

In its initial ruling in this matter, the district court concluded:  (i) the Jobs Monitor's dispute resolution authority encompassed a dispute as to whether severance of common ownership terminated Appellants' obligation to provide job preferences to Heritage Coal employees; and, (ii) until the Arbitrator "has issued a final and binding decision as to the merits of [the Union's claim], this Court has no jurisdiction to hear the [NLRA Section 8 illegality] issue."  *Peabody Holding Co., LLC v. United Mine Workers of Am., Int'l Union*, No. 1:09-cv-1043, 2010 WL 3564274, at *6 (E.D. Va. Sept. 7, 2010).   Appellants noted an appeal of the threshold arbitrability question.  This Court reversed the district court's ruling on the issue of who decides arbitrability, but otherwise affirmed the district court's alternative determination that the dispute fell within the Job MOU's arbitration

---

to pre-October 31, 2007 events, and as Heritage Coal with respect to post-October 31, 2007 events.

clause. *Peabody Holding Co., LLC v. United Mine Workers of Am., Int'l Union*, 665 F.3d 96, 102-107 (4th Cir. 2012).

After renewed merits briefing and oral argument, the Jobs Monitor issued his Arbitration Decision on January 18, 2013. J.A. 55-70. The Jobs Monitor read paragraph 9 of the Jobs MOU to mean that the nonsignatory Companies' obligation to provide jobs to the signatory Employer's employees ends if a *nonsignatory* Company (e.g., Black Beauty) is conveyed to a third party, but not if the *signatory* Employer (i.e., Peabody Coal) is conveyed to a third party. J.A. 60. The Jobs Monitor went on to reject Appellants' federal labor law challenge. J.A. 61-65.

The Jobs Monitor separately held, J.A. 66-67, that Appellants' hiring requirements under the 2007 Jobs MOU continued until December 31, 2011, notwithstanding the fact Heritage Coal and the UMWA terminated their 2007 collective bargaining agreement ("2007 CBA") six months early, and executed their successor collective bargaining agreement ("2011 CBA") on July 1, 2011, together with an accompanying Patriot Coal Corporation Jobs MOU also effective July 1, 2011 ("2011 Patriot Coal Jobs MOU"). J.A. 117-119.

On April 15, 2013, Appellants filed the instant declaratory judgment action in the Eastern District of Virginia seeking to vacate the Arbitration Decision, J.A. 7-16, and the UMWA counterclaimed to enforce it. J.A. 23-33. The district court

4

affirmed the arbitrator's ruling on both points. J.A. 125-156. Accordingly, the NLRA Section 8 illegality issue, which the district court did not reach in its 2010 ruling, is ripe for appellate review.

## IV. STATEMENT OF THE FACTS

Prior to October 31, 2007, Appellant PHC maintained "double-breasted" coal production operations throughout the United States. Double-breasting is a term of art. It refers to a common practice under which a parent company simultaneously conducts business operations utilizing both union-represented and union-free work forces. Peabody Coal was one of PHC's UMWA-represented coal subsidiaries and Appellant Black Beauty was one of PHC's union-free subsidiaries. Effective January 1, 2007, through executing the 2007 CBA, Peabody Coal became a "me too" signatory to the National Bituminous Coal Wage Agreement of 2007 ("2007 NBCWA"), and agreed to "adopt each and every term" of the 2007 NBCWA "and the Memorandum on Job Opportunities." J.A. 75; J.A. 83. *See also* J.A. 76 (defining Peabody Coal as "the signatory Employer" under the Jobs MOU). A "me too" agreement in the unionized coal industry refers to a labor agreement whereby a company that is not a member of the Bituminous Coal Operators Association ("BCOA"), a multiemployer bargaining association, agrees to be bound by the terms of the NBCWA negotiated between the BCOA and the UMWA. Peabody Coal was a signatory to NBCWAs that preceded the 2007

NBCWA, and a "signatory Employer" to the Job MOU since 1993.  J.A. 83.
During the term of the 2007 CBA and the 2007 Jobs MOU, Heritage Coal
(formerly Peabody Coal) operated a coal preparation plant in Kentucky.  J.A. 84.

At the time Peabody Coal became a "me too" signatory to the 2007
NBCWA and a signatory Employer to the 2007 Jobs MOU, it was a wholly-owned
subsidiary of Appellant PHC.  At that time, PHC also owned nonsignatory mining
companies, including Appellant Black Beauty.  J.A. 84.  During the term of the
2007 CBA and 2007 Jobs MOU, however, Peabody Energy Corporation
("Peabody Energy") - the ultimate corporate parent of many coal mining
companies, including Peabody Coal and Appellants - initiated a substantial
corporate restructuring and reorganization.   Peabody Energy spun-off its Eastern
U.S. coal mining operations, consisting of more than forty direct or indirect union
and non-union coal mining subsidiaries, to Patriot Coal.   Peabody Energy
distributed all of Patriot Coal's stock to Peabody Energy's shareholders effective
October 31, 2007 ("Spinoff").  J.A. 84.

As the result of the Spinoff, Patriot Coal, together with its new direct and
indirect coal mining subsidiaries (including Peabody Coal) severed all ownership
connection with Peabody Energy and its retained U.S. coal subsidiaries, including
Appellants.  J.A. 84.  Patriot Coal became an independent, publicly-traded, mining
company (NYSE: PCX).  J.A. 84.   After the Spinoff, Peabody Coal continued to

6

be a UMWA signatory bound to the terms and conditions of the 2007 CBA, J.A. 85, although it changed its name to Heritage Coal effective December 13, 2007 (since post-Spinoff it could no longer use the Peabody name). J.A. 85.

Peabody Coal signed the 2007 Jobs MOU as a limited agent for the "nonsignatory Companies" *i.e.*, Appellant PHC (Peabody Coal's then-parent corporation) and seven non-union PHC mining subsidiaries listed on Appendix A to the 2007 Jobs MOU. J.A. 76, 80-81. Six of these PHC subsidiaries were spun-off to Patriot Coal; Black Beauty was retained within Peabody Energy's corporate family along with its parent PHC. Neither company has had any ownership connection to Heritage Coal (or any other company in the Patriot Coal corporate family) since the Spinoff. J.A. 84.

Shortly after the Spinoff, UMWA and Heritage Coal entered into a Jobs MOU binding Patriot Coal, and the parties subsequently entered into the 2011 Patriot Coal Jobs MOU. In both agreements signatory Employer Heritage Coal did so as an authorized agent for Patriot Coal and its nonsignatory Companies. J.A. 85 at ¶ 14. Both agreements were substantively identical to the 2007 Jobs MOU at issue, with the exception being that through Appendix A these agreement exerted hiring pressure on non-union coal companies within Patriot Coal's corporate family. J.A. 81. The nonsignatory Companies listed in these agreements included the nonunion coal companies previously listed on Appendix A of the 2007 Jobs

7

MOU (except Black Beauty). J.A. 121. These agreements also apply to licensees and independent mining contractors that Patriot Coal's nonsignatory Companies may engage on their coal properties. J.A. 85; J.A. 119-121.

Beginning in 2008, Black Beauty engaged an independent contractor, United Minerals, to open a new coal mining pit on Black Beauty's property in Indiana. J.A. 87. Heritage Coal has no ownership interest in United Minerals, exercises no control over United Mineral's labor relations, and has no legal interest in the Black Beauty properties where United Minerals mines coal using its own non-union workforce. J.A. 87.

Appellant Black Beauty has operated as an open shop in Indiana throughout its history which dates to the 1980s. Black Beauty was acquired by PHC in 1999, and abided by the hiring requirements imposed under successive Jobs MOUs at its mining operations. J.A. 84.

After the Spinoff, Appellants refused to accede to the pressures the Union exerted through the 2007 Jobs MOU to force Black Beauty to provide jobs to Heritage Coal's UMWA-represented employees. J.A. 37. Appellants' refusal to apply the Jobs MOU's hiring requirements after the Spinoff, and refusal to boycott United Mineral's services or require United Minerals to implement the MOU's hiring requirements, prompted the UMWA's enforcement action. *Id.* The UMWA sought to compel Appellants' post-divestiture compliance with the Jobs MOU by

pursuing the grievance mechanism in the MOU, and ultimately filing its counterclaim, J.A. 24-33, to enforce the Arbitration Decision, J.A. 125-156.

## V.       SUMMARY OF ARGUMENT

A union's ability to enforce a labor contract provision that is designed to protect or preserve the work of the bargaining unit it represents is tempered by Section 8(e) of the NLRA.  Longstanding Supreme Court precedent establishes that a work preservation clause is valid only if (i) its purpose and effect is preservation of the work performed by the signatory employer's bargaining unit, and (ii) the signatory employer has the right of control over the work; i.e., the employer must have the power to give the bargaining unit employees the work in question.

In the case below, the district court enforced the Arbitration Decision that interpreted an agreement between the UMWA and Heritage Coal called the Jobs MOU to require Appellant Black Beauty Coal Company to provide hiring preferences at its union-free coal mining operations to Heritage Coal's UMWA-represented employees.  Although Black Beauty and Heritage Coal were both subsidiaries of Appellant PHC on January 1, 2007, when Heritage Coal entered into the Jobs MOU, Heritage Coal became a wholly owned subsidiary of Patriot Coal, a separate, publicly-traded company on October, 31, 2007.

Enforcement of the Arbitration Decision would require Black Beauty to

9

boycott the services of its independent mining contractor, United Minerals, and would require Black Beauty to displace members of its own non-union workforce in favor of current and former Heritage Coal employees. It would also require Heritage Coal to make its employees available to fill job vacancies at Black Beauty, even though Appellants and Heritage Coal's parent, Patriot Coal, have been industry competitors since November 1, 2007.

The district court agreed that the Union could not satisfy the right-of-control test because UMWA-signatory Heritage Coal had no ability to control work at Black Beauty's mining operations after October 2007. The court nevertheless concluded Appellants did not qualify for the protection Section 8(e) affords employers confronted by a union's unlawful secondary pressure, because they were not "neutral." The caselaw establishes that the right of control test will be disregarded only in those rare situations where the record establishes that the signatory employer engaged in an action that had the effect of surrendering control over work that is fairly claimable by the bargaining unit. The district court's pivotal conclusion that Appellants are not neutral employers misapprehends the right of control test, finds no support in the facts, and imputes a bad faith motive to the October 31, 2007 divestiture of Heritage Coal that the UMWA itself has never advanced in this case.

The district court also concluded the Arbitration Decision did not offend

10

Section 8(e)'s preservation-of-bargaining-unit-work test.   However, the only purpose of the Jobs MOU is to deter the assignment or allocation of bargaining unit work to a non-union related entity in the double-breasted context (i.e., related companies conducting operations in the same industry with both union and non-union workforces).   After Heritage Coal became a wholly owned subsidiary of Patriot Coal, Appellant PHC no longer had any ability to influence whether resources and work opportunities would be allocated to Heritage Coal or to Black Beauty.   In the absence of common ownership, there was no Heritage Coal bargaining work to be had at Black Beauty, and requiring non-union Black Beauty to fill vacancies at its operations with Heritage Coal's represented employees could only have a prohibited secondary purpose.

The Jobs MOU, as enforced by the district court, also violates Sections 8(b)(1) and (2) of the NLRA.   These sections guarantee employees the right to assist and join unions, and the right to refrain from such activities.   It is well established that contractually-promised preferences based upon prior work with a union signatory are unlawful.   That is precisely the effect of the Arbitration Decision.   In the absence of common ownership, Black Beauty must set aside jobs at its union free operations for Heritage Coal's UMWA-represented employees. Their right to these jobs is not grounded in any service they provided to Black Beauty.   Rather, it results solely from their union membership and employment

with unrelated Heritage Coal under a union labor agreement. The district court erred when it relied on the fact the job preferences were rooted in employment with a signatory that had at one time been related to Black Beauty. While that may have provided a sufficient nexus while the companies were under common ownership (which was the situation in the caselaw cited by the district court), continued enforcement of the jobs set-aside against a separate and unrelated employer constitutes nothing more than the prohibited granting of employment rights based on union membership.

Even if this Court concludes the Arbitration Decision does not violate Sections 8(b) and 8(e) as applied to Appellants, the Decision does not draw its essence from the agreement insofar as the Arbitrator found that Appellants were required to offer jobs to Heritage Coal's employees even after Heritage Coal terminated its 2007 CBA on July 1, 2011.

While it is true that an arbitration decision is entitled to great deference, the courts will vacate a decision which is based on external considerations that do not exist. This is one of those rare situations. In this case, the Arbitrator assumed Peabody Coal executed a new CBA after it became a Patriot Coal subsidiary and changed its name to Heritage Coal. It did not. Because the Arbitrator assumed that Heritage Coal terminated this second, imagined and non-existent CBA on July 1, 2011, he never construed the effect termination of the actual 2007 CBA had on

the Jobs MOU that Peabody Coal signed as agent for PHC and Black Beauty, which was incorporated by reference into the actual 2007 CBA that Heritage Coal did terminate. Since the Arbitrator interpreted an agreement that never existed, not the CBA he was assigned to interpret, his decision does not draw its essence from the agreement.

## VI.    STANDARD OF REVIEW

The ordinary standard for reviewing an arbitrator's decision interpreting the terms of a labor agreement is whether the decision fails to draw it essence from the agreement. *Mountaineer Gas Co.  v. Oil, Chem. & Atomic Workers Int'l Union*, 76 F.3d 606, 608 (4th Cir. 1996). This Court generally reviews the district court's summary judgment order *de novo* viewing all facts and drawing all inferences in the light most favorable to the non-moving party. *PBM Products, LLC v. Mead Johnson & Co.*, 639 F.3d 111, 119 (4th Cir. 2011); *Coward v. Jabe*, 474 F. App'x 961, 962 (4th Cir. 2012) (vacating grant of summary judgment), *vacated and remanded by*, *Coward v. Jabe*, 532 F. App'x 328, 329 (4th Cir. 2013) (same).

The federal courts have an "absolute duty" to determine whether a contract violates federal law before enforcing it, and, as such, the National Labor Relations Board ("NLRB") does not have exclusive jurisdiction. *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982) (Section 8(e) challenge to purchased coal clause in UMWA contract). Accordingly, this Court reviews *de novo* as-applied challenges

13

to an arbitrator's interpretation of a collective bargaining agreement brought under Section 8 of the NLRA. *Marrowbone Dev. Co. v. Dist.17*, *UMWA*, 147 F.3d 296, 300 (4th Cir. 1998) (NLRA Section 8 illegality defense in a contracting out case).

## VII.    ARGUMENT

### A. Enforcement of the Jobs MOU Violates Sections 8(b)(4) and 8(e) of the National Labor Relations Act.

The NLRA permits a union to bargain for contract provisions that "preserve" the work of the bargaining unit for which the union has obtained bargaining rights. However, Sections 8(b)(4)[2] and 8(e)[3], 29 U.S.C. §§ 158(b)(4) and (e), constrain a

---

[2] Section 8(b)(4)(ii), 29 U.S.C. § 158(b)(4)(ii), provides that it shall be unfair labor practice for a labor organization or its agents:

> (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object there of is –
> > (A) forcing or requiring any employer or self-employed person to join in any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section;

[3] In relevant part, Section 8(e), 29 U.S.C. § 158(e), states:

> It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer . . . agrees . . . to cease doing business with any other person, and any contract or agreement entered into heretofore containing such an agreement shall be to such extent unenforceable and void.

14

union from enforcing contract provisions that affect the labor relations of a neutral employer not controlled by the signatory, or advance union objectives secondary to preserving the work of the bargaining unit covered by the agreement. The Arbitration Decision's imposition of union hiring preferences on Black Beauty, a neutral, secondary employer, is unlawful because the Union cannot satisfy either the preservation-of-work or the right-of-control tests that are a prerequisite to removing the Jobs MOU from the prohibitions of Section 8(e). *See NLRB v. Int'l Longshoremen's Ass'n* ("*ILA I*"), 447 U.S. 490, 504 (1980); *NLRB v. Int'l Longshoremen's Ass'n* ("*ILA II*"), 473 U.S. 61, 79-80 (1985); *National Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 644-46 (1967).

### 1. The Genesis of the Jobs MOU Confirms that its Hiring Obligations are Anchored Exclusively to the Existence of Double-Breasted Mining Operations.

The context in which the Jobs MOU became a fixture in the 1993 and subsequent NBCWAs is well documented. As part of the 1988 NBCWA, the UMWA:

> bargained for a JOBS provision [NBCWA Article II] which granted preferential hiring rights to union-represented employees at any existing, new or newly-acquired operation of a signatory employer or with the lessee or licensee of a signatory employer. The Union took this idea one step further in the [1993 NBCWA].

Daniel L. Stickler & Erin F. Magee, *The National Bituminous Coal Wage*

15

*Agreement of 1993 and the Memorandum of Understanding Regarding Job Opportunities: Is "Double Breasting" Dead*?, 15 E. Min. L. Found. § 5.01 (1994) (hereinafter "Stickler & Magee EMLF Article").

In conjunction with negotiating the 1993 NBCWA the UMWA staged a strike of Peabody Coal and certain other UMWA signatory employers to curtail what the Union perceived to be the practice of non-union parent corporations allocating coal reserves and other resources to their non-union mining subsidiaries, to the detriment of the parent's UMWA-represented mining subsidiaries. J.A. 27 at ¶ 11. Although the Union did not obtain the signatory employers' agreement to an anti-double-breasting clause, or a union standards clause requiring that union-free sister companies adopt the terms and conditions of the 1993 NBCWA, the strike did result in Peabody Coal and other UMWA signatory companies entering into the 1993 Jobs MOU. J.A. 27. The Jobs MOU has been renewed essentially unchanged in every subsequent round of NBCWA negotiations since 1993. J.A. 50 at ¶4.

Significantly, the jobs provision in Article II of the predecessor 1988 NBCWA applied only to jobs at the *signatory company's* non-union mining operations (or its lessees' or contractors' non-union operations); work which the signatory unquestionably had the power to control. The 1993 Jobs MOU, by contrast, garners preferential hiring at the "double-breasted" mining operations of

16

the signatory Employer's non-union sister companies (and at any non-union operations of their mutual parent).   J.A. 76.   The District of Columbia Circuit Court fielded an early as applied challenge to the 1993 Jobs MOU, summarizing its origin as follows:

> One of the issues on which the [1993 NBCWA] negotiations focused was on the proclivity of some companies to operate both union and nonunion mines, the latter allegedly to avoid the obligations of past [NBCWAs].  Accordingly, the [1993 NBCWA] included a Memorandum of Understanding Regarding Job Opportunities (MOU).  Under the MOU, each signatory was to sign as a limited agent of its nonsignatory parent and its nonsignatory subsidiaries, thereby obliging those nonunion members *of a family corporate structure* to offer three out of every five new classified job openings to qualified laid-off or active miners from the signatory company's bargaining unit.

*KenAmerican Resources, Inc. v. Int'l Union, UMWA*, 99 F.3d 1161, 1162 (D.C. Cir. 1996) (emphasis added).

The Jobs MOU is an express agreement that memorializes UMWA pressure on the "signatory Employer" and on the "nonsignatory Companies" for the term of the Agreement - pressure that encumbers coal mine development and expansion, and alters and disturbs the makeup of the workforce at both the signatory and the nonsignatory Companies.  The pressure comes in various forms.  First, the Jobs MOU imposes top-down, secondary hiring pressure on the nonsignatory Companies that flows down to their independent mining contractors (and their

17

subcontractors).  J.A. 76.  *See generally*, Stickler & Magee EMLF Article at 133-35.  The non-union, double-breasted coal subsidiaries must offer three-of-five new job openings at their operations to members of the signatory Employer's bargaining unit.  Additionally, the lessees, licensees and, importantly for the instant case, independent mining contractors of the nonsignatory Companies must populate their wholly separate, union-free workforce with signatory company bargaining unit members.  J.A. 78 ("[Jobs] MOU shall apply to . . . contracts and subcontracts of the nonsignatory Companies entered into . . . where the coal produced from . . . contracted or subcontracted bituminous lands or bituminous coal mining operations is produced or processed for, and sold by the nonsignatory Companies.")

Second, the Jobs MOU additionally exerts primary pressure on the signatory Employer in the form of continually making its bargaining unit members available for employment elsewhere.  J.A. 77 ("It shall be the obligation of the signatory Employer to provide notice to its active miners of new job openings . . . as they become available at the nonsignatory [Company's] operation.").  The signatory Employer must post these vacancy notices at the active worksites of its UMWA-represented mining operations, and provide laid off employees notification of such job openings by certified mail.  J.A. 7.  As a matter of contract, the mandatory Jobs MOU notice and hiring requirements interfere with the signatory Employer's

18

autonomy and labor relations; and they must be followed whether or not the signatory Employer wants its valued and experienced bargaining unit members to accept employment elsewhere.

The legal predicate for expanding employment beyond the signatory employer's bargaining unit to reach separate non-union employers was not grounded, as the district court erroneously suggests, J.A. 149, 153, on the existence of a NLRA-sanctioned "multiemployer bargaining unit" between the signatory Employer and the nonsignatory Companies. The existence of such a multiemployer bargaining unit is expressly disavowed in the MOU.[4]  Nor was it premised on the existence of an alter ego, single employer, or joint employer relationship that might provide a basis in law for collapsing the corporate separateness of legally distinct employers, and thereby support a determination that the signatory Employer constructively controlled the nonsignatory Companies' hiring practices.[5]

---

[4] J.A. 76 ("The parties agree that the nonsignatory bituminous coal mining operations referred to in this MOU are separate from and not included in any bargaining unit heretofore or currently existing in the coal industry.").

[5] J.A. 76 ("Nothing in this MOU, its implementation, its execution, the discussions leading to its execution, or the negotiations for the NBCWA of 2007, shall create, or be used or offered as evidence in any forum to create, a joint employer, single employer, alter ego, agency, successor, or other type of relationship between or among the signatory Employer and the nonsignatory Companies.").

Rather, the Jobs MOU's legal underpinning is predicated solely upon, and tethered to, the existence of double-breasted coal operations - i.e., the signatory Employer and its non-union sister companies sharing a common parent. Stickler & Magee EMLF Article at 136-138. The Jobs MOU treats the signatory Employer as constructively controlling the work performed at its nonunion sister companies through the device of obtaining the agreement of their common parent to do so; an entity which, in theory, can exercise control over the operations of its nonunion subsidiaries. As the district court acknowledged, J.A. 128, the Union twice secured substantially identical Jobs MOU commitments from Patriot Coal after the Spinoff. This demonstrates that the UMWA understood the road for obtaining preferential hiring rights for Heritage Coal's bargaining unit post-divestiture ran through Patriot Coal's corporate family structure, not Peabody Energy's corporate family.

Since the Jobs MOU is premised exclusively on common ownership, and not on the signatory Employer's actual control over hiring and work assignments at the double-breasted non-union companies (or their contractors), even its lawful application within the double-breasted context appears to contravene NLRB precedent generally respecting corporate separateness.[6] *See, e.g.*, Stickler & Magee

---

[6] The NLRB's right of control test, discussed *infra* at 25-29, is not satisfied merely because two companies share a common parent. *See, e.g., In'tl Ass'n of*

20

EMLF Article § 5.05.

## 2. The Only Federal Court Case to Decide a NLRB Section 8 Challenge to the Jobs MOU Confirms that Common Ownership is the Linchpin to Enforcement.

The Jobs MOU has previously been construed by a trial court to survive a NLRA Section 8 challenge. *See KenAmerican Resources, Inc. v. Int'l Union, UMWA*, No. 95-2252, 1996 WL 251859, at *3 (D.D.C. May 8, 1996), *rev'd on other grounds*, 99 F.3d 1161 (D.C. Cir. 1996). But *KenAmerican* only addressed the Jobs MOU's legality within the context of an existing double-breasted coal operation analogous to that which Appellant PHC maintained before the Spinoff.

On appeal, the District of Columbia Circuit Court observed that the non-union coal companies claimed that the 1993 Jobs MOU was not "designed to preserve bargaining unit work but rather to reach out and affect the labor relations of a neutral employer*." KenAmerican*, 99 F.3d at 1163. However, the Court ruled in the non-union coal operators' favor on a procedural ground, and never

---

*Bridge Structural and Ornamental Iron Workers,* 328 NLRB 934, 936 (1999) ("[F]act that the signatory employer owns another business entity would not, without more, establish that the signatory employer had control over the assignment of work performed by the other entity"); *Northeast Ohio District Council of the United Brotherhood of Carpenters and Joiners of America*, 310 NLRB 1023, 1026 (1993) (invalidating an anti-double breasting clause on Section 8(e) grounds when the employers were related, after determining that the clause "would apply even in circumstances where the signatory employer did not have the power to assign the disputed work to unit employees"); *United Telegraph Workers v. NLRB*, 571 F.2d 665, 666 (D.C. Cir.) ("common ownership is not determinative where common control is not shown"), *cert. denied*, 439 U.S. 827 (1978).

21

reached the provision's validity under Section 8 of the NLRA.

The district court's analysis of the 1993 Jobs MOU in *KenAmerican* is nevertheless instructive in two respects. First, in permitting the nonsignatory companies to reapply for interim injunctive relief, the district court recognized that even in a commonly owned, double breasted context the pressures exerted on the non-union companies through enforcement of the MOU were plainly disruptive of their existing mode of business. *See, e.g., KenAmerican,* 1996 WL 251859, at *3 ("compliance with this ruling could cause considerable disruption of the KenAmerican operations and the lives of its non-union employees."). The same can be said here with respect to post-Spinoff enforcement of the 2007 Jobs MOU.

Second, the *KenAmerican* trial court recognized that, within the context of a commonly owned, double-breasted coal operation, the non-union companies were not "neutral employers" who could use Section 8 as a shield from UMWA hiring pressure. In this regard, the court noted:

> [The non-union coal companies] contend that . . . enforce[ment] of the Jobs MOU's requirement that [they] offer 60% of their jobs to displaced union members on the panels from which the [UMWA-signatory] Ohio Valley companies hired, constitute an illegal ''secondary objective'' . . . in violation of Section 8(e).
>
> Plaintiffs are not entitled either to summary judgment, or to defeat [the UMWA's] motion, on this ground. In order to receive the protections of Section 8(e), the secondary employer must be

22

'neutral.'  As stated above, the two groups of companies here are so interrelated by *common ownership as well as functionally* that they may not be fairly characterized as ''neutral'' within the meaning of Section 8(e) as construed.

*KenAmerican,* 1996 WL 251859, at *3 (emphasis added).  The same cannot be said here in the context of the Union's post-Spinoff enforcement of the 2007 Jobs MOU.

### 3.  The Arbitrator's Construction of the Jobs MOU Violates Sections 8(b)(4) and 8(e) of the NLRA as Applied to Appellants.

Section 8(b)(4)(ii) of the NLRA, 29 U.S.C. § 158(b)(4)(ii), makes it unlawful for a union to coerce any person engaged in commerce to force or require such employer to enter into any agreement prohibited by Section 8(e) of the NLRA.  Section 8(e) prohibits "agreement[s]" in which a contracting employer agrees to refrain from or "cease doing business" with another employer.  As the district court noted, Section 8(e)'s cease-doing-business requirement need not be satisfied literally; it may be met merely by a primary employer "exert[ing] any pressure calculated to cause a significant change or disruption of [a] neutral employer's mode of business." J.A. 147 (quoting *Sheet Metal Workers, Local Union No. 91 v. NLRB,* 905 F.2d 417, 421 (D.C. Cir. 1990)).  *See also International Longshoremen Local No. 1410 (E. Harris Mercer & Mobile Steamship Ass'n Inc.,* 235 NLRB 172, 179 (1978) (cease-doing-business

23

requirement satisfied "if the contractual provision has the purpose or effect of interfering with normal business relationships.").  In the instant case, the Union's as-applied enforcement of the MOU has the post-Spinoff effect of pressuring the primary employer, Heritage Coal, to make its employees available to a Patriot Coal competitor; disrupting secondary employer Black Beauty's mode of business, including its labor relations and hiring practices; and pressuring Black Beauty to boycott the contract mining services of United Minerals, an independent non-union contractor.

Contract clauses that constrict or encumber relations between a signatory employer and other employers do not violate 8(e) if they have a primary "work preservation" objective.  If the "union's efforts are directed at its own employer on a topic affecting the employee's wages, hours or working conditions that the employer can control" then the activities are primary.  *ILA II*, 473 U.S. at 81. However, entering into and maintaining a purported work preservation agreement is lawful *only* if: (1) the purpose and effect of the agreement is to preserve the work performed by the signatory employer's bargaining unit employees; *and* (2) the unionized employer has the right of control over the work being assigned.  *ILA I*, 447 U.S. at 503-04  ("[T]he contracting employer must have the power to give the employees the work in question.").  When application of an agreement results in work acquisition as opposed to work preservation for the union bargaining unit,

24

*or* when the signatory employer does not have control over the work being sought, the agreement is secondary and unenforceable. *ILA II*, 473 U.S. at 79-80 n.19. Here, the Arbitration Decision requiring Black Beauty to give work to the employees of unrelated Heritage Coal fails both tests.

### a. The Union Cannot Satisfy the Right of Control Test.

Under Section 8(e), the fifty-year-old, "right to control" doctrine provides the "authoritative" test for determining whether union pressures memorialized in a collective bargaining agreement violate federal labor law. Robert A. Gorman & Matthew W. Finkin, *Labor Law Unionization and Collective Bargaining*, at 359 (2d ed. 2004). *See also NLRB v. Enterprise Ass'n of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Machine, and General Pipefitters of New York and Vicinity, Local Union No. 638*, 429 U.S. 507, 517 (1977) (hereinafter "*Pipefitters*") ("Section 8(e) does not prohibit agreements made for . . . the purpose of preserving for the *contracting employees* themselves work traditionally done by them.") (emphasis added). However, the right to control test narrows the use of a work preservation clause by specifying that the "contracting employer must have the power to give the employees the work in question." *ILA I*, 447 U.S. at 504 ("[I]f the contracting employer has no power to assign the work, it is reasonable to infer" that the agreement's objective is "to influence whoever does have the power over the work.") In such case "the [contracting employer] would be a neutral bystander

25

and the agreement would . . . become secondary." *ILA I*, 447 U.S. at 504 (quoting

*National Woodword Mfrs. Ass's*, 386 U. S. at 644-645).

The NLRB's recent decision in *Road Sprinkler Fitter, United Ass'n of Journeymn and Apprentices of the Plumbing and Pipe Fitting Industry of the U.S. and Canada, Local Union No. 669,* 357 NLRB  No. 176 (2011) explains clearly why the right of control test cannot be met in the absence of common ownership. In this case, Cosco, a member of a multiemployer bargaining association, and union-free Firetrol Protection Systems, had the same parent.  Firetrol asserted that an anti-double breasting provision agreed to by the Association and the union constituted a facial violation of Section 8(e).  The clause provided in pertinent part:

> Should the Employer establish or maintain operations that are not signatory to this Agreement, under its own name or another or through another related business entity to perform work of the type covered by this Agreement . . .  the terms and conditions of this Agreement shall become applicable to and binding upon such operations at such time as a majority of the employees of the entity . . . designates the Union as their exclusive bargaining representative.

*Id.* at *10.


In addressing the facial legality of the clause the NLRB majority noted that "[t]he purpose of a properly drafted antidual shop clause is to prevent the signatory employer from diverting unit work to an entity not formally bound by the

26

collective-bargaining agreement *while continuing to control and profit from the performance of the work*." *Id.* at *3 (emphasis added). The disagreement between the NLRB majority and dissenting member Brian Hayes turned on whether the phrase "Should the Employer establish or maintain operations that are not signatory to this Agreement" was limited exclusively to situations where the signatory actually controlled the nonsignatory entity. Member Hayes concluded the phrase "establish or maintain" is in the disjunctive, and it would apply in the event a signatory simply established another business entity. *Id.* at *7 ("An employer can establish another entity without thereafter exercising control over it. This is quite common, for example, in the case of company 'spinoffs'"). *Id.* at *7.

The majority acknowledged the dissent's concern, but concluded that because the language "does not, on its face, clearly extend to entities outside the signatory employer's control, we construe it to extend no farther than permitted by law." *Id.* at *3. Specifically, the majority noted:

> A different case would be presented if the Union had sought to enforce [the clause] *where the signatory employer no longer exercised control over an entity it had once established*. This is the situation envisioned in the dissent, but it is not an issue here.

*Id* at *4 n.5 (emphasis added). But that *is* the situation here; signatory Employer Peabody Coal was spun off to Patriot Coal and could not thereafter exercise control over work performed at Black Beauty.

27

The Arbitration Decision requires that Black Beauty reserve jobs for members of Heritage Coal's bargaining unit, even though: (i) Heritage Coal is owned by independent and publicly traded Patriot Coal; (ii) Heritage Coal has no post-Spinoff connection to PHC or Black Beauty; (iii) Patriot Coal and Black Beauty have been competitors in the bituminous coal mining industry since the Spinoff; and (iv) Heritage Coal bargaining unit members have had job rights throughout Patriot Coal's double-breasted coal operation since the Spinoff.  J.A. 119-121, 128.  *Road Sprinkler Fitters* illustrates why the Arbitration Decision enforcing job-set-asides for Heritage Coal's bargaining unit members at Black Beauty after common ownership ended violates the right of control test, and is therefore unlawful.

Consistent with exercising unencumbered control over its labor relations post-divestiture, Black Beauty contracted out certain mining work to United Minerals in 2008, and it is that work the UMWA claims in this case.  J.A. 74. Even assuming PHC and Black Beauty were not neutral employers prior to the Spinoff, a point Appellants do not concede but that this Court need not reach, it is indisputable that: (i) Appellants have been neutral employers during the period for which the UMWA has pressured them to implement the Jobs MOU's hiring requirements; and (ii) Heritage Coal (the contracting employer) has no ability to control work at Black Beauty's mining operations.  As neutral employers within

the meaning of Section 8 of the NLRA, Appellants Black Beauty and Peabody Holding Company are properly shielded from the UMWA's secondary pressures, which take aim at and threaten to displace Appellants' post-divestiture workforce.

### b. The District Court Misapplied the Right to Control Test when it Found Appellants Are Not Neutral.

The district court conceded that Heritage Coal did not have the power to assign the work sought by the UMWA because it had "lost any measure of actual control when it was spun off to Patriot [in 2007]," and acknowledged that this "fact would seem to end the inquiry." J.A. 151. The district court nevertheless enforced the Arbitration Decision, concluding, without any supporting facts, that Appellants were not neutral employers. J.A. 153-154.

This conclusion finds no support in the record. Heritage Coal (formerly Peabody Coal) lost any power to control work at Black Beauty as a consequence of the Spinoff in 2007 in much the same way as it first acquired the power to control that work in 1999 –i.e., through a bona fide, corporate business decision. Black Beauty had conducted surface mining operations, principally in Indiana, since the 1980s. J.A. 84 at ¶ 7. It became majority owned by PHC in February 1999, at which time it first became subject to the job opportunity provision in Peabody Coal's Jobs MOU. J.A. 84.

As such, from February 1999 through October 2007, Peabody Coal had the

ability to control Black Beauty's work, through their common parent, and Black Beauty acceded to the UMWA's hiring pressures during this interregnum of common control. J.A. 84. Significantly, however, both before and after the 8-year window of common ownership, Peabody Coal lacked the ability to control the assignment of work at Black Beauty (or its contractors). So while the NLRB and reviewing courts do not, as the district court noted, mechanically apply the right to of control test, there is no basis for eschewing the straightforward application of the test on this record.

Indeed, the NLRB's exception to the right of control test has been applied to overcome neutral employer status in but a handful of distinguishable instances, and generally only after NLRB fact finding. *See* Gorman & Finkin, *Labor Law Unionization and Collective Bargaining*, at 359 (framing the exception as "whether the signatory employer has itself undertaken the initiative to negotiate away its right of control contrary to a labor-contract provision.").

By way of illustration, in *Local 917, Int'l Bhd. of Teamsters v. NLRB*, 577 F.3d 70 (2d Cir. 2009), a recent right of control case relied on by the district court, during the term of a labor agreement Diageo, a large liquor supplier, informed Peerless, a union-signatory liquor wholesaler, that Diageo's liquor deliveries to the wholesaler's warehouse would now be made as directed by Diageo. This change eliminated unit work that was being performed by Peerless' Teamsters-represented

drivers. This loss of work notwithstanding, the NLRB rejected the union's claim that the signatory wholesaler was an "offending employer." The Second Circuit enforced the NLRB's order over the union's renewed "offending employer" claim, observing that, as applied, "enforcement of the [work preservation clause] in [Local 917's] collective bargaining agreement . . . would have effected a secondary boycott of Diageo." *Local 917, Int'l Bhd. of Teamsters*, 577 F.3d at 78. As here, presumptively lawful union pressure directed to Peerless during the term of its collective bargaining agreement became prohibited secondary pressure violative of Section 8(e) after a supervening event beyond its control affected the signatory employer's business relationship with Diageo.

The case law and commentary underscore that the "offending employer" exception is limited to instances (not present here) where a union demonstrates affirmative conduct undertaken unilaterally by the union signatory employer itself to negotiate away, voluntarily cede, or intentionally forfeit or surrender *its* right of control over the claimed work. *See, e.g.*, *Pipefitters*, 429 U.S. at 512, 514, 533 (union contractor not an "offending employer"); *George Koch Sons, Inc. v. NLRB*, 490 F.2d 323, 328 (4th Cir. 1973) (no evidence union contractor was an "offending employer" that "surrender[ed] its right-to-control"); *Local 917*, *Int'l Bhd. of Teamsters,* 577 F.3d at 78 ("no indication" Peerless "affirmatively sought a provision yielding to Diageo unilateral authority to change [delivery] terms" to the

detriment of its Teamster-represented delivery employees).  In *Painters Dist. Council No. 20 (Uni-Coat)*, 185 NLRB 930 (1970), by contrast, the signatory employer was not immune from union pressure where, after negotiating a labor-contract provision binding its unit to paint using only rollers and brushes, it voluntarily forfeited its right to control the work by getting a spray painting license and entering into a commercial contract requiring its unit employees to spray paint a substantial housing complex.

Peabody Energy's divestiture of its Eastern U.S. bituminous coal mining business was undertaken by Appellants' ultimate parent corporation -  an entity that was not party to or bound by the Jobs MOU.  The Spinoff was undertaken for reasons that are a matter of public record, as reflected in contemporaneous disclosures made to the U.S. Securities and Exchange Commission to provide notice to institutional and individual investors worldwide.  Indeed, the Spinoff created publicly-traded Patriot Coal, at the time one of the largest mining companies in the U.S.  J.A. 84 ¶¶ 8-9.

While the "offending employer" exception to the right of control requirement may have an equitable overlay, the equities here favor Appellants. The Union itself did not challenge the bona fides of Peabody Energy's October 31, 2007, corporate reorganization in prosecuting its Jobs MOU claim.  Moreover, Peabody Coal's employees obtained employment rights at Patriot Coal's

nonsignatory Companies, including six of the seven nonsignatory Companies identified in the original 2007 Jobs MOU.  J.A. 84.

This notwithstanding, the district court expressed concern that, "as an equitable matter, . . . allowing [PHC and Black Beauty] to evade their obligations would set the stage for employers with less benign intentions to manipulate the corporate form to the detriment of the collective bargaining process."  J.A. 153. This concern is misplaced, however, because the Jobs MOU includes a provision that specifically protects the Union and the bargaining units it represents from inequitable corporate manipulations and abuses of the corporate form, a safeguard the Union did not raise in this matter.  J.A. 76 ¶ 2  ("The nonsignatory Companies agree that they will not engage in any transaction, restructuring or reorganization for the purpose of evading the obligations of this MOU.").

In short, there is no basis on the record, in equity, or otherwise, for the district court's characterization of Appellants as "offending employers."  The court erred by making inferences unsupported by the parties' factual stipulations, J.A. 49-54; J.A. 72-74, and by imputing the business decisions of Peabody Energy to its lower-tier subsidiaries.[7]    Invoking the limited and rarely-used "offending

---

[7] At a minimum, Appellants are entitled to have all inferences drawn from the facts applied in their favor, not the Union's.  *See* Fed. R. Civ. P. 56 (viewing all facts and drawing all inferences therefrom in the light most favorable to the non-moving party); *PBM,* 639 F.3d at 119; *Coward*, 474 F. App'x. at 962.

employer" exception to the right of control test is unwarranted and unsupported in this case and constitutes reversible error.

### c. Enforcing the Arbitration Decision Does Not Preserve the Work of Heritage Coal's Bargaining Unit.

The Arbitrator's construction of the Jobs MOU is unlawful because, as applied to Appellants, it also violates Section 8(e)'s work preservation requirement.   Awarding Heritage Coal's UMWA-represented employees hiring preferences at Black Beauty or United Minerals is purely work-acquisitive because there is no Heritage Coal bargaining unit work to be "preserved". As applied to an unrelated employer, the Jobs MOU can only have secondary effects.

The Supreme Court has explained that, in order to assess whether a contract provision such as the Jobs MOU violates Section 8(e), the inquiry is properly directed to whether "under all the surrounding circumstances, the Union's objective was preservation of work for [bargaining unit] employees, or whether the agreements and boycott were tactically calculated to satisfy union objectives elsewhere." *National Woodwork*, 386 U.S. at 644.  Agreements fall within the Section 8(e) prohibition where the objectives of the agreement are designed to affect the labor relations of a separate third-party employer and are therefore secondary.  Even if a clause is valid as negotiated, it may not be lawful as a union ultimately seeks to enforce it.   A reviewing court must look to the totality of the

34

evidence to determine whether the clause was designed to further a secondary objective. *See, e.g., Pipefitters*, 429 U.S. at 521 n.8 (Even though a provision may be "valid in its application in other contexts, efforts to apply the provision so as to influence someone other than the immediate employer are prohibited.")

The district court concluded that time is fixed for purposes of testing the objective of a work preservation clause; if the objective of the clause was valid when entered into, changed circumstances do not render it invalid. But a valid initial objective does not always yield lawful, as-applied enforcement efforts down the road. Appellants are not, as the district court suggests, seeking to "retroactively impute improper motives" to the Union back to January 2007. J.A. 149. Rather, Appellants only challenge the Union's work preservation objectives in seeking as-applied enforcement of the Jobs MOU after the October 31, 2007 Spinoff.

As discussed in more detail in part VII.A.1., *supra*, the MOU's work preservation objective rested on the construct that the common parent could allocate work as between signatory and nonsignatory companies. In the absence of a common parent, applying pressure to an unrelated non-union company cannot be explained or justified as lawful pressure to deter a parent from diminishing the work of the signatory by directing resources and job growth to a nonunion subsidiary. By way of example, the Jobs MOU could not have had a valid work

35

preservation purpose had the Union successfully pressured Peabody Coal and a never-related coal industry employer such as Alpha Natural Resources to enter into an agreement that required Alpha to give job preferences to Peabody Coal's UMWA-represented employees. This is because the work to be preserved must be the work of the bargaining unit—not just work of the type done by Peabody Coal's bargaining unit. The Union never explains why, if enforcement of union job preferences against an unrelated non-union employer is unlawful in the first instance, the fact that common ownership *once* existed immunizes the illegality of requiring Black Beauty -- a now unrelated, neutral non-union employer -- to fill new job openings with its *former* sister company's laid-off and active UMWA members. Moreover, it defies logic and the Section 8(e) work preservation exception to suggest that Heritage Coal preserves its Kentucky-based bargaining unit work by the UMWA's pressuring Heritage Coal to invite its experienced union coal miners to go to work in Indiana in a completely separate bargaining unit for a an unrelated, independent, non-union coal company.

The district court relied on *Becker Elec. Co. v. Int'l Bhd. of Elec. Workers, Local Union No. 212*, 927 F.2d 895 (6th Cir. 1991), a double-breasting case from the Sixth Circuit, and the wording of Section 8(e) itself, for its view that a presumptively valid work preservation clause cannot through changed circumstances result in maintenance of unlawful secondary pressure. J.A. 148-

149.  *Becker* does not support this conclusion, because it involved a facial challenge by commonly owned IBEW signatory companies to a newly-proposed IBEW anti-double-breasting clause.  In this context, the court did not disturb the magistrate judge's finding that the IBEW "face the threat of losing traditional work to a nonunion doublebreast."  *Becker*, 927 F.2d 899.  Even in that context, the Sixth Circuit upheld the clause after establishing that it "only addresses efforts by the primary employer to avoid the CBA by performing union jobs through other entities it controls."  *Id.*

Second, Section 8(e) has not been construed to limit the determination of the lawfulness of a work preservation clause to the time of its negotiation, where changed circumstances leave the union with no basis for seeking jobs at a neutral employer.  While one could argue that application of the Jobs MOU to PHC and Black Beauty could have preserved bargaining unit work for Heritage Coal's employees *prior* to the Spinoff, no such rationale is available *after* the Spinoff.  After the Spinoff, the job set asides required by the Jobs MOU would acquire work for Heritage Coal's employees at an unrelated and nonsignatory employer.  In *Marrowbone*, 147 F.3d 296, this Court rejected the Union's similarly expansive claim that the work preservation element of the *ILA I* test is directed toward preserving the "type" of work that the union's members have performed at other bargaining units, finding instead that the requirement is directed toward preserving

37

the specific work of the bargaining unit.  For purposes of the instant case, the salient point is that the work being preserved must be the work of Heritage Coal's bargaining unit, not work of a type done by UMWA-represented mineworkers generally at other unrelated employers.

After the Spinoff, the Union cannot assert that the MOU retains a valid work preservation purpose.  Post-Spinoff, PHC has no ability to allocate resources to Heritage Coal, and no authority to make decisions that might displace or deprive Heritage Coal's employees of work opportunities available at *their* UMWA-represented bargaining unit.  Rather, since November 2007, these decisions have rested with Patriot Coal, which has secured for Heritage Coal's laid-off miners and active bargaining unit members preferential consideration for new jobs within Patriot Coal's corporate structure.

Enforcement of the Jobs MOU after the Spinoff is inherently disruptive to Black Beauty's mode of business, and goes beyond protecting unit work which, during the term of the Jobs MOU, revolved around operating a coal preparation plant in Kentucky.  J.A. 83 ¶ 5.  *See, e.g., Lone Star Steel Co. v. NLRB*, 639 F.2d 545, 559 (10th Cir. 1981) (reversing the NLRB for ignoring the ALJ's finding that former Article II(f) of 1974 NBCWA "goes beyond protecting unit work standards" where it "could operate in areas not necessarily competitive with the work unit employees are doing, e.g. coal preparation facilities as opposed to

38

mining.")  Rather than protecting the job security of bargaining unit employees, the Jobs MOU, as applied, unlawfully facilitates organizational objectives beyond the unit.  When a union "seeks to serve the interests of employees in its bargaining unit not as employees of their existing employer, but as potential employees of some other employer, the arrangement is legally viewed as secondary."  *Pacific Northwest Chapter of the Associated Builders and Contractors, Inc. v. NLRB*, 654 F.2d 1301, 1317 (9th Cir. 1981), *aff'd in  part*, *vacated in part, Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645 (1982).

By insisting post-Spinoff on seeding secondary (or tertiary) employers' open shop operations with UMWA bargaining unit members or laid off former members, enforcement of the Jobs MOU impermissibly advances union recognition objectives.   The existing workforce at these separate mining operations, consistent with their NLRA Section 7 rights, have demonstrated their preference for handling their labor relations directly with management, without union representation.  *See generally*, Edwin S. Hopson & George J. Miller, *The Impact of Article II of the National Bituminous Coal Wage Agreement of 1988 on the Sale, Acquisition, and Operation of Coal Property*, 11 E. Min. L. Found. § 8.03[1] (1990) (discussing the hiring provision in NBCWA Article II, which is limited by its terms to operations of a signatory Employer and its contractors,

39

noting "[p]resumably if 60 percent of the entire work force consists of UMWA members, the operation will not remain a nonsignatory operation."). This rings true even if those interested in the jobs are not members of Heritage Coal's Kentucky preparation plant bargaining unit, but are instead former employees who worked elsewhere under prior Peabody Coal CBAs before being laid off.

Nor can the Union maintain that it is disinterested in obtaining representation rights at Black Beauty. For example, an organizing video the Union distributed in 2007 prominently features Black Beauty's Francisco Mine entrance in its coverage. *See, e.g.*, Justice at Peabody, http://www.youtube.com/watch?v=YTKAunldBZM. Thus, in the absence of common ownership, promoting Union organizing objectives becomes the Jobs MOU's *only* purpose, because the work of the Heritage Coal bargaining unit is not affected, much less threatened, by Black Beauty's mining operations.

### B. Forcing Appellants To Provide Hiring Preferences Based On Union Membership Violates Sections 8(b)(1)(A) And 8(b)(2) Of The NLRA.

Section 7 of the NLRA guarantees employees the right to engage in activities related to assisting and joining unions, and the right to refrain from such activities. 29 U.S.C. § 157. Section 8(b)(1)(A) makes it unlawful for a union "to restrain or coerce employees in the exercise of the rights guaranteed" in Section 7. 29 U.S.C. § 158(b)(1)(A). Section 8(b)(2) makes it unlawful for a union to "cause

40

or attempt to cause an employer to discriminate against an employee" in violation of Section 8(a)(3). 29 U.S.C. § 158(b)(2). Section 8(a)(3), in turn, prohibits "discrimination in regard to hire or tenure of employment or any term or condition of employment" that encourages or discourages union membership. 29 U.S.C. § 158(a)(3).

It is well established that contractually-promised preferences based upon prior work with a union signatory are unlawful. *IATSE, Local 659 (MPO-TV of California)*, 197 NLRB 1187 (1972), *enf.,* 477 F.2d 450 (D.C. Cir. 1973); *Directors Guild of America, Inc. (Ass'n of Motion Picture & Television Producers, Inc.)*, 198 NLRB 707 (1972), *enf.,* 494 F.2d 692 (9th Cir. 1974), *review denied, enforcement granted sub nom. Security Bureau, Inc. v. NLRB*, 926 F.2d 1215 (D.C. Cir. 1991); *New York Typographical Union No. 6*, 242 NLRB 378 (1979), *enforcement granted in part, denied in part*, 632 F.2d 1971 (2d Cir. 1981); *Teamsters Local 600 (TNT Holland Motor Express)*, 24 NLRB Advice Mem. Rep. ¶ 34025 (LRP Publ'ns) (1994).

In *IATSE, Local 659,* the NLRB considered a preferential hiring arrangement in which the union sought to compel hiring from a roster maintained by the union. The only way to get on the roster was to work for an employer that had a labor agreement with the union. The arrangement caused MPO-TV to refuse to hire two cameramen who were not on the roster and who could not be placed on

41

the roster because they had not worked previously for a unionized employer under a union contract.  The NLRB found that arrangement violated Section 8(b)(1)(A) and ordered the union to cease and desist from enforcing the provision.

In *IATSE, Local 659*, the NLRB cited *Teamsters Freight Local No. 480*, 167 NLRB 920 (1967), *enforced*, 409 F.2d 610 (6th Cir. 1969), a prior NLRB decision where a union "endtailed" the seniority of employees of a newly acquired employer that had no union contract but indicated that it would have "dovetailed" their seniority if the employees had possessed seniority rights under a collective-bargaining contract.  The NLRB found this preference for workers previously employed by a union-represented employer unlawful, noting "the existence of a collective-bargaining contract connotes representation by a labor organization." *IATSE, Local 659*, 167 NLRB at 923.

Similarly, the NLRB held that a roster arrangement violated Section 8(b)(1)(A) and 8(b)(2) where it required prior experience with an employer signatory to a union labor agreement.  *Directors Guild of America (Ass'n of Motion Picture & Television Producers, Inc.)* 198 NLRB at 710.  Notably, in *Teamsters Local 600 (TNT Holland Motor Express)* the NLRB's General Counsel stated:

> The Board will find unlawful the maintenance of a contractual referral or hiring preference that is unlawful on its face.  That theory applies to hiring hall and job

42

> referral rules that are based upon prior work with a union
> signatory rather than upon prior employment in the
> bargaining unit.

24 NLRB Advice Mem. Rep. ¶ 34025.

The established labor law principles enunciated by the NLRB in *IATSE,
Local 659, Teamsters Freight Local No. 480,* and *Teamsters Local 600* (*TNT
Holland Motor Express*) have been recognized by the federal circuit courts. *See,
e.g.*, *Teamsters Local Union No. 523 v. NLRB*, 590 F.3d 849 (10th Cir. 2009). The
Tenth Circuit, for example, determined that a union violated Section 8(b)(2) of the
NLRA when, in the context of merging two bargaining units, it insisted that a
previously unrepresented employee be placed at the bottom of the seniority roster.

The Arbitration Decision and the district court's ruling below compels
Black Beauty to offer the first 3 out of every 5 jobs at its existing and future
operations to the employees of Heritage Coal – individuals who must be members
of the UMWA by virtue of the NBCWA's longstanding "union security clause."
The Union's as-applied enforcement of the 2007 Jobs MOU may also serve to
displace nonunion miners Black Beauty and/or United Minerals hired after the
divestiture. J.A. 115. *See, also KenAmerican,* 1996 WL 251859, at *3 (noting the
prospect for disruption and displacement of non-union miners). Affording such
hiring preferences to Heritage Coal's employees based upon their current or former
union employment in an entirely separate bargaining unit(s) is unlawful because it

violates Sections 8(b)(1) and 8(b)(2) of the NLRA.

The district court concluded that applying the MOU's hiring preferences to Black Beauty does not violate Sections 8(b)(1)(A) and 8(b)(2) because "the ultimate objective of the agreement … is not merely to reward union membership, but to provide the nonsignatory mining companies with access to an experienced pool of miners." J.A. 144. But a provision that, as applied, compels a unionized employer to serve for several years as a job referral agency for the putative benefit of an unrelated, secondary employer cannot be defended as solely directed to preserving Heritage Coal's bargaining unit work. Moreover, it is simply not plausible that a signatory Employer would commit contractually to facilitating the departure of its most senior and talented workers to apply their skills and expertise for the benefit of a competitor –qualifications the signatory Employer has grown to depend upon in profiting from its own cohesive mining operations. As applied to Appellants, the objective and effect of the Jobs MOU is to provide job preferences on the basis of an individual's union experience and status.

The district court also opined that "it is seniority achieved through work with [Peabody Coal] the signatory company, rather than membership in the Union per se, that entitles miners in the bargaining to jobs at nonsignatory companies," J.A. 144 (citing *Courier-Citizen Co. v. Boston Electrotypers Union No. 11, Int'l Printing & Graphic Commc'ns Union of N. America*, 702 F.2d 273, 278 (1st Cir.

1983)).  The district court's reliance on *Courier-Citizen* is misplaced.  That case did not challenge the validity of a clause that required a separate employer to provide jobs to the union-represented employees of an unrelated company.  Rather, the First Circuit merely affirmed that a disputed clause requiring a signatory employer to make non-bargaining unit jobs available to its own union-represented employees did not violate the NLRA.

Moreover, the rationale that its only Heritage Coal's union employees who qualify, and they earned the right to jobs at Black Beauty based on their UMWA seniority, misses the point.  The fact the MOU does not require Black Beauty to give a hiring preference to *every* member of the UMWA does not make it any less a hiring preference rooted in – and exclusively rooted in – an individual's current or prior UMWA membership.  It is also immaterial that the Jobs MOU prioritizes seniority with unrelated Heritage Coal as the mechanism for allocating which Union member has priority for job openings at non-union Black Beauty and its contractors.  Injecting seniority with the signatory to schedule which Union member has first choice for a job in no way vitiates the fact that the job openings are set aside for union-represented employees of an unrelated company.

Article I of Heritage Coal's UMWA labor contract specifies that "as a condition of employment all Employees at operations covered by this Agreement shall be, or become, members of the [UMWA], to the extent and in the manner

45

permitted by law." J.A. 93. In accordance with the Jobs MOU, the only individuals who can obtain job preferences at Black Beauty through enforcement of the Arbitration Decision are "miners who are either currently working for [Heritage Coal] or were laid off by Peabody Coal." *Peabody Holding Co.*, 665 F.3d at 98. These are necessarily miners who gained the hiring preference solely by virtue of their status as UMWA members who work (or worked) under a UMWA labor contract(s). In the absence of common ownership there is no meaningful legal distinction between forcing Black Beauty (and its contractors) to hire the UMWA-represented employees of Heritage Coal, and forcing them to hire the UMWA-represented employees of some other UMWA signatory employer.

### C. The Arbitrator's Finding That Appellants' Obligations Under the 2007 Jobs MOU Survived The July 1, 2011 Termination Of The 2007 CBA Does Not Draw Its Essence From The Agreement.

Effective January 1, 2007, Peabody Coal and the UMWA entered into the 2007 CBA, which expressly incorporated the 2007 Jobs MOU by reference. J.A. 75 ("The parties hereto agree to adopt each and every term of the 2007 NBCWA, including . . . the Memorandum of Understanding Regarding Job Opportunities. *These provisions are hereby incorporated by reference and constitute the agreement between the parties*.") (emphasis added). Both agreements contained December 31, 2011 termination dates. J.A. 78 at ¶ 11; J.A. 110. However, Heritage Coal accelerated the termination of the 2007 CBA, and entered into a new

46

2011 CBA and a new 2011 Jobs MOU on July 1, 2011. J.A. 118. The 2011 CBA superseded and extinguished the 2007 CBA, including the 2007 Jobs MOU "incorporated by reference" in the latter. The contracting parties' bilateral termination of the 2007 CBA also extinguished any hiring requirement that may have been enforceable against Appellants under the 2007 Jobs MOU (which Peabody Coal signed as a limited agent for Appellants).

Notwithstanding the foregoing, the Arbitrator concluded that Appellants remained obligated to offer Heritage Coal's employees jobs until December 31, 2011 – i.e., six months *after* Heritage Coal and the UMWA terminated the 2007 CBA and 2007 Jobs MOU incorporated by reference and made a part thereof. The Arbitrator reached this conclusion because he wrongly assumed that Heritage Coal executed a new and different labor agreement with the UMWA sometime after the Spinoff.[8]

---

[8] The Arbitrator provided the following explanation for his conclusion:

> The record is silent, however, concerning which Wage Agreement the Union and PCC terminated in July 2011 – that which they had signed in January 2007, which formed the basis for the MOU binding PHC and Black Beauty, *or that which they signed post-October 31, 2007*, which bound Patriot and six nonsignatory subsidiaries, but not PHC or Black Beauty (emphasis added). It is clear, however, that the July 1, 2011, MOU, associated with the Wage Agreement signed on that date, bound only Patriot and its nonsignatory subsidiaries, *suggesting*

47

However, Peabody Coal and Heritage Coal are just different names for the same legal entity, and Peabody Coal did not execute another labor agreement after it became a subsidiary of Patriot and changed its name to Heritage Coal.  J.A. 85 at ¶¶ 12-13. (after the name change, Heritage Coal remained a signatory and "continued to maintain its mining operations in Kentucky.")

This erroneous factual assumption caused the Arbitrator to conclude that "the [new] Wage Agreement signed [on July 1, 2011] was intended to replace *that signed post-October 31, 2007*, which was associated with the MOU binding Patriot and its nonsignatory subsidiaries, not that of January 1, 2007, which bound PHC and Black Beauty."  J.A. 67.   In fact and law the July 1, 2011 CBA could *only* have replaced the January 1, 2007 CBA and the Jobs MOU incorporated by reference therein, because there was never a "post-October 31, 2007 Wage Agreement" to replace.

The district court noted that the Arbitrator "held that the new [2011] agreements did not terminate plaintiffs hiring obligations under the 2007 MOU,"

> *that the Wage Agreement signed that date was intended to replace that signed post-October 31, 2007*, which was associated with the MOU binding Patriot and its nonsignatory subsidiaries not that of January 1, 2007 which bound PHC and Black Beauty (emphasis added).

J.A. 67.

48

and concluded that this "falls squarely within the universe of issues committed to arbitration." J.A. 139. Appellants do not take issue with the district court's statement that the role of the judiciary is limited to determining whether the arbitrator is arguably construing or applying the contract; not whether he committed serious error. J.A. 140. The problem with the court's cursory acceptance of what the Arbitrator said is that he did not construe the January 1, 2007 CBA, the only CBA that in fact existed, and the only CBA that could have been terminated July 1, 2011. Rather, he construed an imagined "post-October 31, 2007" Wage Agreement, and his decision turned on the effect of terminating this nonexistent CBA -- not the effect of terminating the real 2007 CBA.

Because the Arbitrator assumed a fact that did not exist, and a CBA that did not exist, he failed to construe the very 2007 CBA he was assigned to interpret. This bizarre situation resulted in his decision that the 2007 CBA and the Jobs MOU incorporated by reference therein (which Peabody Coal signed as agent for PHC and Black Beauty) was not terminated on July 1, 2011, but simply expired by its own terms six months later.

Although it is well settled that judicial review of an arbitration award is "among the narrowest known to law," *United States Postal Serv. v. American Postal Workers Union*, 204 F.3d 523, 527 (4th Cir. 2000), it is equally well established that an arbitration award must draw its essence from the contract,

49

*Mountaineer Gas Co.*, 76 F.3d at 608.  An arbitration decision that is based on external considerations which do not exist or flatly contradict the arbitrator's conclusion does not draw its essence from the agreement.  *See Electronics Corp. of America v. Int'l Union of Electrical, Radio and Machine Workers,* 492 F.2d 1255, 1257 (1st Cir. 1974) (award cannot stand where the fact underlying an arbitrator's decision is concededly a non-fact and the parties cannot fairly be charged with the misapprehension); *National Post Office Mailhandlers v. United States Postal Serv.*, 751 F.2d 834, 843 (6th Cir. 1985) (arbitrator misapprehended date of a discharged employee's guilty plea analyzing it as if the plea pre-dated the discharge but it post-dated the discharge, so the employer could not have relied upon it) ("[W]here the record that was before the arbitrator demonstrates an unambiguous and undisputed mistake  . . . by the arbitrator in making his award, it can be fairly said that the arbitrator 'exceeded his powers, or so imperfectly executed them' that vacation may be proper.").  Because the Arbitrator in this case relied on a fact that did not exist, *and* a labor contract that did not exist, his decision does not draw its essence from the agreement and must be vacated.

## VIII.    CONCLUSION

For the foregoing reasons, Appellant respectfully request that the Court reverse the district court judgment and enter judgment for Appellants.

## IX.    REQUEST FOR ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a) and Local Rule 34(a), Appellants respectfully request that oral argument be heard in this appeal.  This case presents questions of first impression with substantial importance regarding the scope of the secondary boycott protections in Section 8 of the NLRA following a corporate divestiture.

Respectfully submitted ,

_____/s/ John R. Woodrum_____
John R. Woodrum
W. Gregory Mott
Zachary S. Stinson
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
1909 K Street, Suite 1000
Washington, D.C.  20006
202-887-0855
Fax:  202-887-0866

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [XX ]this brief contains 11,783 words, exclusing the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ]this brief uses a monospaced typeface and contains [*state the number of]* lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because:

   [XX  ]this brief has been prepared in a proportionally spaced typeface using 14-point type, and the word processing system of Microsoft Word 2010; or

   [ ] this brief has been prepared in a monospaced typefac using [*state name and version of word processing program]* with [*state number of characters per inch and name of type style*].

Dated:  March 23, 2015

                        _____/s/ John R. Woodrum_____
                        John R. Woodrum
                        W. Gregory Mott
                        Zachary S. Stinson
                        OGLETREE, DEAKINS, NASH,
                        SMOAK & STEWART, P.C.
                        1909 K Street, Suite 1000
                        Washington, D.C.  20006
                        202-887-0855
                        Fax:  202-887-0866

                        *Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of March, 2014, I caused the foregoing Brief of Plaintiff-Appellants to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered ECF users:

> Diana Migliaccio Bardes
> John Robert Mooney
> MOONEY, GREEN, SAINDON,
>    MURPHY & WELCH, PC
> 1920 L Street, Suite 400
> Washington, D.C.  20036
>
> Art Traynor
> UNITED MINE WORKERS OF AMERICA
> 18354 Quantico Gateway Dr., #200
> Triangle, VA  22172
>
> *Counsel for Defendant-Appellee*

I further certify that on the 24th day of March, 2014, I will, by Federal Express deliver the required number of bound copies of the Brief of Appellants and Joint Appendix to the Clerk of the Court and to counsel for Defendant-Appellee at the above-address.

> _____/s/ John R. Woodrum_____
> John R. Woodrum
> *Counsel for Plaintiff-Appellant*