Record No. 14-2032

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

PEABODY HOLDING COMPANY, LLC

AND

BLACK BEAUTY COAL COMPANY, LLC, now known as
Peabody Midwest Mining, LLC

*Plaintiffs-Appellants,*

v.

UNITED MINE WORKERS of AMERICA
INTERNATIONAL UNION,

*Defendant-Appellee,*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT ALEXANDRIA

RESPONSE BRIEF OF APPELLEE

John R. Woodrum
W. Gregory Mott
Zachary Steven Stinson
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
1909 K Street, Suite 1000
Washington, DC 20006
202-887-0855

Diana Migliaccio Bardes
John Robert Mooney
MOONEY, GREEN, SAINDON,
MURPHY & WELCH, PC
1920 L Street, Suite 400
Washington, D.C. 20036
202-783-0010

Art Traynor
UNITED MINE WORKERS OF
AMERICA
18354 Quantico Gateway Dr., #200
Triangle, VA 22172

*Counsel for Plaintiffs-Appellants*

*Counsel for Defendant-Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-2032__    Caption: Peabody Holding Co. LLC and Black Beauty Coal Co., LLC v. UMWA

Pursuant to FRAP 26.1 and Local Rule 26.1,

United Mine Workers of America, International Union
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

10/28/2013 SCC

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                         ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Arthur R. Traynor                    Date:    4/23/2015

Counsel for: United Mine Workers of America

## CERTIFICATE OF SERVICE
**************************

I certify that on _____ 4/23/2015 _____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

/s/ Arthur R. Traynor                                4/23/2015
    (signature)                                        (date)

# TABLE OF CONTENTS

**PAGE**

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW................1

STATEMENT OF THE CASE.................................................................1

SUMMARY OF THE ARGUMENT...............................................13

STANDARD OF REVIEW...........................................................19

ARGUMENT...............................................................................20

   I.  The District Court Properly Declined to Revisit the Facts
       Found In the Award..........................................................20

  II. Enforcement of PHC and Black Beauty's Promise to Offer
      Jobs To Miners Employed and Laid Off By PCC Before the
      Spinoff Does Not Violate the NLRA......................................21

        A. The JOBS MOU was entered into and is now being
           enforced for the lawful purpose of preserving work to
           miners who worked in the UMWA bargaining unit..............24

        B. As co-parties to the JOBS MOU both before and after
           the spinoff of PCC, its former parent and affiliate are not
           neutral unrelated employers.......................................38

        C. The JOBS MOU does not discriminate on the basis of
           union membership....................................................42

CERTIFICATE OF COMPLIANCE.............................................45

CERTIFICATE OF SERVICE....................................................46

i

## TABLE OF AUTHORITIES

**Cases**                                                          **Page**

*American Trucking Ass'n, Inc. v. NLRB*, 734 F.2d 966 (4th Cir. 1984) .................. 34

*Becker Electric v. IBEW Local 212*, 927 F.2d 895 (6th Cir. 1991) ................... 27, 29

*California Cartage v. NLRB*, 822 F.2d 1203 (D.C. Cir. 1987).................... 33, 36, 39

*Chipman Freight Svcs., Inc. v. NLRB*, 843 F.2d 1224 (9th Cir. 1988),
cert. denied, 488 U.S. 848 (1988) ........................................................... 40

*Consolidation Coal Co. (UMWA Dist. 31)*, 305 NLRB 545(1991)........................... 2

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984).................. 40

*Courier-Citizen Co. v. Boston Electrotypers Union No. 11, Int'l Printing &
Graphic Commc'ns Union of N. Am.*, 702 F.2d 273 (1st Cir. 1983) ....................... 43

*Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203 (1964) ........................ 22

*Int'l Longshoremen's Ass'n. v. Allied Int'l, Inc.*, 456 U.S. 212 (1982)................. 39

*KenAmerican Resources Inc. v. Int'l Union, UMWA*, No. 95-2252,
1996 WL 251859 (D.D.C. May 8, 1996) ................................................... 16

*Linden Lumber Co. v. NLRB*, 419 U.S. 301 (1974)................................................. 31

*Marrowbone Dev. Co. v. Dist. 17, United Mine Workers of Am.*,
147 F.3d 296 (4th Cir. 1998)..................................................................... 19

*Mine Workers District 31 v. NLRB*, 879 F.2d 939 (D.C. Cir. 1989) ...................... 28

*Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Int'l Union*,
76 F.3d 606 (4th Cir. 1996)....................................................................... 19

*National Woodwork Manufacturers Assn. v. NLRB*, 386 U.S. 612
(1967) ............................................................................ 22, 23, 36, 38, 39

*NLRB v. Int'l Longshoremen's Assn. ("ILA I")*, 447 U.S. 490
(1980) ............................................................... 22, 24, 25, 26, 29, 30

*NLRB v. Int'l Longshoremen's Assn. ("ILA II")*, 473 U.S 61
(1985) ...................................................... 23, 25, 26, 27, 28, 30, 33, 34

*NLRB v. Enter. Ass'n of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic
Tube, Ice Mach. & Gen. Pipefitters of N.Y. & Vicinity, Local Union
No. 638*, 429 U.S. 507 (1977) .................................................... 40

*NLRB v. General Motors Corp* 373 U.S. 734 (1963) ............................ 43

*NLRB v. Pipefitters Local 638*, 429 U.S. 507 (1977).................. 24, 25, 36

*Pattern Makers' League v. NLRB*, 473 US 95 (1985)............................ 43

*Peabody Holding Co., LLC v. United Mine Workers of Am., Int'l Union*, 665 F.3d
96 (4th Cir. 2012) ...................................................................... 2

*Peabody Holding Co., LLC v. United Mine Workers of Am.*, No. 1:09cv1043, 2010
WL 3564274 (E.D. Va. Sept. 7, 2010)................................................ 2, 8

*PPG Indus. Inc. v. Int'l Chem. Workers Union Council of United Food &
Commercial Workers*, 587 F.3d 648 (4th Cir. 2009) ............................ 19

*Production Workers Union, Local 707 v. NLRB*, 793 F.2d 323 (D.C. Cir.
1986)............................................................................................ 38, 39

*Road Sprinkler Fitters Union 669 v. NLRB*, 789 F.2d 9 (D.C. Cir. 1986) ............ 29

*Textile Workers v. Lincoln Mills*, 353 U.S. 448 (1957) ......................... 20

*Town and Country Electric v. NLRB*, 516 U.S. 85 (1995)....................................... 32

*United Paperworkers Intl Union v. Misco, Inc.*, 484 U.S. 29 (1987).............. 19, 20

*United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564 (1960)....... 20

*United Steelworkers of America v. American Warrior & Gulf Navigation Co.,* 363 U.S. 593 (1960) ........................................................................................ 20

*United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593 (1960) ................................................................................................ 20

iv

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

I.  Whether the district court erred in its application of the deferential standard of review of labor arbitration awards to enforce an award of job offers at Peabody Holding Company, LLC ("PHC") and Black Beauty Coal Company, LLC ("Black Beauty") to miners who worked for an affiliate of PHC and Black Beauty?

II. Whether Sections 8(b) or 8(e) of the National Labor Relations Act ("NLRA") prohibit the district court from affirming the arbitrator's enforcement of PHC and Black Beauty's commitment to offer jobs to a once-affiliated company's miners whose right to those job offers was earned before the affiliated employer was spun off as a separate entity?

## STATEMENT OF THE CASE

This is an appeal from a decision of the United States District Court for the Eastern District of Virginia enforcing a labor arbitrator's award ordering PHC and Black Beauty to abide by their written agreement to offer job opportunities to miners who had been employed by their corporate affiliate. At issue are the miners' rights to such job offers that were both promised and accrued before their employer was spunoff into a separate entity. No putative right to job offers earned as the result of any miners' post-spinoff employment has been asserted or at issue in any stage of these proceedings. The following recitation of relevant facts and

1

procedural history borrows heavily from the undisputed facts recited in the

"Background" section of the opinion of the district court now on review. JA at

125-133. As noted in that opinion, an extensive discussion of the facts in this case

is discussed in two prior opinions issued in what has become a litigation campaign

of coal company opposition to enforcement of their obligations at every turn:

*Peabody Holding Co., LLC v. United Mine Workers of Am.*, No. 1:09cv1043, 2010

WL 3564274 (E.D. Va. Sept. 7, 2010), *aff'd sub nom.*, *Peabody Holding Co., LLC*

*v. United Mine Workers of Am., Int'l Union*, 665 F.3d 96 (4th Cir. 2012).

PHC and Black Beauty are mining companies, the latter a subsidiary of the

former. J.A. 126. Both companies are ultimately owned by Peabody Energy

Corporation ("PE"), which at one point owned several other mining companies that

operated in the Eastern United States, including Peabody Coal Company ("PCC").

*Id*. The United Mine Workers of America ("UMWA" or "Union") is a labor

organization that represented miners employed by PCC. Miners employed by PCC,

like all coal miners, work in an industry that by combinations of market forces an

geologic conditions, subjects them to cycles alternating between intense activity

and deep unemployment. *Consolidation Coal Co. (UMWA Dist. 31)*, 305 NLRB

545, 546 (1991).

In January 2007, PCC entered into a labor agreement with the Union, known

generally as the National Bituminous Coal Wage Agreement ("NBCWA" or

2

"Wage Agreement"). JA at 126. The agreement included a Memorandum of Understanding Regarding Job Opportunities ("JOBS MOU"), which PCC executed on behalf of itself (as a "signatory" company) and as a limited agent of its immediate parent, PHC, and fellow subsidiaries (all "nonsignatory" companies), Black Beauty among them. JA at 126; JA at 76-80.[1]

The JOBS MOU was first negotiated in 1993 between the Union and the Bituminous Coal Operators' Association ("BCOA") – a multiemployer bargaining group. JA at 126. The agreement resulted from the Union's strike of Peabody Coal and certain other UMWA signatory employers, which was motivated by the UMWA's desire to curtail a practice of non-union parent corporations of signatory employers allocating coal reserves and other resources to their non-union mining subsidiaries, to the detriment of the miners employed by the parent's UMWA-represented subsidiaries. JA at 27, ¶11. The JOBS MOU has been renewed

---

[1] A note to prevent confusion over terminology: The district court, like the text of the JOBS MOU, uses the term 'signatory company' to refer to the corporate subsidiary that directly employs the bargaining unit of unionized miners and is therefore signatory to the NBCWA collective bargaining agreement. It uses the term 'nonsignatory company' to refer to the non-union subsidiaries of the corporation that do not directly employ the unionized miners and are not signatory to the NBCWA, but are nevertheless full-fledged parties to the JOBS MOU and bound by the work preservation provisions therein to offer three out of five new job opportunities to miners employed or laid off by their unionized affiliate.

essentially unchanged in every subsequent round of NBCWA negotiations since 1993. JA at 50, ¶4.

The intent of the parties in executing the JOBS MOU, reflected in its statement of purpose, was to "provide job opportunities for work of a classified nature to certain laid-off and active miners" by requiring nonunion mining companies within PHC's corporate family to offer three out of every five new classified job openings to miners who were either working for or laid off by PCC, the signatory employer. JA at 126; JA at 76. The JOBS MOU's limited application to "classified" work refers to those coal mining functions traditionally performed by unit employees. JA at 94. The nonunion subsidiaries within PHC's corporate family were required to make the employment offers to miners employed or laid off by PCC based on seniority and without regard to union membership status. JA at 77-78.

Each offer made pursuant to the JOBS MOU ran or would have run to the benefit of a specific employee in the PCC unit, who must have registered his or her willingness to receive such offers by filing an appropriate "panel form" (for laid off miners) or notice of interest (for active miners), and must have possessed "the ability to step into and perform the work of the job at the time the job is awarded." JA at 77. All offers must have been accepted within three days or they would be deemed automatically rejected; and one rejection by a given employee would

remove that individual from any further consideration for job openings at that particular location. JA at 77. Employees who accepted or would have accepted a job offer at PHC, Black Beauty or any other nonunion subsidiary in the corporate family would have no claim to union representation on the job, no assurance of any minimum employment standards or conditions, and no guarantee of retention. Once hired, they would stand or fall on the same basis as all other employees at the non-union operation.

By its terms, the JOBS MOU applied only to "existing, new, or newly acquired nonsignatory bituminous coal mining operations of the nonsignatory [c]ompanies," and it "[did] not constitute a covenant running with the land and [did] not apply to the sale of nonsignatory coal lands, coal reserves or coal operations (either asset sales or stock sales) of the non-signatory [c]ompanies." JA at 127; JA at 76. Moreover, nothing in the JOBS MOU "encumber [ed] or limit[ed] in any way the rights of the nonsignatory [c]ompanies to sell, exchange, release, or otherwise similarly convey ... any of their nonsignatory coal lands, coal reserves or coal operations to third parties." JA at 127; JA at 78. The parties agreed that their obligations under the JOBS MOU would terminate at 11:59 p.m. on December 31, 2011. *Id.*

The JOBS MOU also contained an arbitration clause, which extended dispute-resolution authority to a "Jobs Monitor":

> In order to effectuate the implementation of these job opportunity provisions, the [Union] and the non-signatory [c]ompanies subject to this [MOU] agree that the impartial Jobs Monitor ... shall serve as the monitor under this [MOU]. The monitor shall review the job selections pursuant to these provisions and investigate any alleged violations herein. The monitor shall have the authority to request such information which may be reasonably necessary in order to secure compliance with the job selection provisions. The parties have the obligation to comply with such requests.

JA at 127; JA at 79. The Jobs Monitor's decisions were to be "final and binding on all parties" subject to the limitation that the Jobs Monitor could not "alter, amend, modify, add to or subtract from, or change in any way the provisions" of the contract. JA at 128; JA at 79.

In October 2007, less than a year after the parties had renewed the NBCWA and accompanying JOBS MOU, PE initiated a significant spinoff of its mining operations in the eastern United States. JA at 128. The spinoff gave birth to a new publicly-traded entity, Patriot Coal Corporation ("Patriot"), which gained control over PCC and the rest of PHC's former subsidiaries, with the notable exception of Black Beauty. *Id.* In addition to retaining ownership of Black Beauty,[2] PE also remained the parent company of PHC. *Id.* As a result, PHC and Black Beauty have not had any common ownership over PCC or to any other Patriot-owned entity

---

[2] Following the spinoff, Black Beauty was renamed "Peabody Midwest Mining, LLC." In the interest of clarity, the district court continued to refer to the company by its erstwhile name. JA at 128.

since the spinoff.[3] *Id*. PCC thereafter entered into a substantively identical job-preference agreement with the Union as a limited agent of Patriot and its nonunion coal mining subsidiaries, which agreed to be bound by its terms going forward. *Id*.

In early 2008, Black Beauty contracted with a private mine operator, United Minerals, LLC ("United Minerals"), to conduct surface mining operations at its property located in Warrick County, Indiana. JA at 129. (United Minerals has no ownership relationship to PCC or any of the other Patriot companies.) *Id*. In November 2008, the Union wrote to PE to state its expectation that PHC and Black Beauty would continue to comply with the JOBS MOU. JA at 129; JA at 36. Specifically, the Union directed both companies to "make the requisite job offers" to PCC's classified employees, "keep the Union informed of such mining operations as they develop," and "give the required notice of the job selection process to the Jobs Monitor." JA at 129; JA at 37. The companies responded that "once the prerequisite corporate relationship between PHC and PCC was severed (as of October 31, 2007), obligations under the Jobs MOU also were severed. An obligation to secure job opportunities for UMWA members ... does not survive

---

[3] PCC was also renamed, and since the spinoff has operated as "Heritage Coal." As above, however, the district court referred to the company by the name it used when the agreement between the parties was signed. JA at 128.

7

conveyance of the UMWA-represented subsidiary to a third party such as Patriot
Coal Company." JA at 129.

Disputing the assertion that PHC and Black Beauty were no longer bound by
the JOBS MOU, the Union submitted its grievance to the Jobs Monitor. JA at 129.
Each of the parties provided the Jobs Monitor with materials supporting their
respective arguments, though PHC and Black Beauty maintained that they did not
"accept or acquiesce to consideration by the Job [sic] Monitor of claims asserted
under the [JOBS MOU], as that instrument no longer applie[d]" to them. JA at 130.
After ruling that the parties had agreed to arbitrate the question of arbitrability
under the JOBS MOU, the Jobs Monitor found that the dispute was arbitrable but
deferred a final resolution on the merits until further argument could take place. JA
at 130.

PHC and Black Beauty responded by filing a declaratory judgment action in
the United States District Court for the Eastern District of Virginia, in which they
asked for a declaration that the Union's claim was not arbitrable. *Id.* The Union, for
its part, filed a counterclaim seeking a declaration that the Jobs Monitor's decision
was enforceable and that the companies must comply with the decision and
proceed to a hearing on the merits. *Id.* The court entered judgment in favor of the
Union, holding that the Jobs Monitor properly determined the arbitrability of the
dispute. *Peabody*, 2010 WL 3564274, at *5–*6. The court further held that the

8

dispute was arbitrable in any event—that is, even if the arbitrator lacked authority to decide the question. *Id.* at *6.

PHC and Black Beauty appealed, and this Court affirmed on the ultimate question of arbitrability. *Peabody*, 665 F.3d 96. Although this Court determined that a federal court, not the Jobs Monitor, was required to decide the arbitrability question, it independently held that PHC and Black Beauty could not rebut the ordinary presumption in favor of arbitrability. *Id.* at 105–07. This Court then ordered the parties to proceed to arbitration on the merits question. JA at 131.

Back before the Jobs Monitor, the parties agreed to bifurcate the arbitration proceedings, "treating in [the first stage] solely the question of whether PHC and Black Beauty continued to be bound by the MOU after the October 31, 2007, spinoff." JA at 131; JA at 57. Included in this analysis was the companies' submission to the Jobs Monitor of a claim that enforcement of the JOBS MOU sought by the Union would violate Sections 8(e) and 8(b) of the NLRA. JA at 61-65. In the event that the Union prevailed on that question, and the parties subsequently failed to agree on an appropriate remedy, the Jobs Monitor would "resol[ve] the remedy issue" in the second stage. JA at 131; JA at 57.

Before the Jobs Monitor, the Union sought notice of job opportunities "only for those PCC employees who were active or laid off prior to the October 31, 2007

termination of common ownership" between PCC, PHC and Black Beauty – the

period when the three parties to the JOBS MOU were all affiliated PE subsidiaries.

JA at 65. The Arbitrator noted that "the Union does not claim MOU rights at

PHC/Black Beauty for those PCC employees who were hired by PCC after the

common ownership relation was broken, but before the expiration of the MOU."

*Id*. The Arbitrator expressly stated that he was not considering or awarding "a

remedy for PCC employees hired after the termination of common ownership but

before expiration of the MOU." JA at 66.

On January 18, 2013, the Jobs Monitor issued the Arbitration Award (the

"Award") at issue in this matter. JA at 131. In it, he concluded that "[t]he absence

of common ownership between PCC, the signatory employer to the [JOBS MOU],

and PHC/Black Beauty, the nonsignatory employers bound by the MOU,

subsequent to PE's October 31, 2007, spinoff of PCC, did not terminate the

obligations of PHC/Black Beauty under the MOU." JA at 131; JA at 69. In other

words, the Jobs Monitor concluded that PHC and Black Beauty were still required

to offer PCC miners the rights to job opportunities they accrued prior to the

spinoff, notwithstanding the intervening change in corporate relationships. JA at

131. The Jobs Monitor made three findings essential to this conclusion. *Id*. First, he

found that "there [had] been no bona fide sale of either PHC or Black Beauty, the

nonsignatory subsidiaries of PE, to an unrelated third party," which would free

10

them of their obligations under the terms of the JOBS MOU. JA at 132; JA at 60.

Second, he found that "requiring PHC/Black Beauty to offer hiring preferences to

the employees of PCC" would not violate federal labor law, regardless of the lack

of common ownership. JA at 132; JA at 61-63. Finally, he found it irrelevant that

PCC and the Union had entered into different (substantively identical) wage and

job-preference agreements following the spinoff, by which time PCC was acting as

limited agent of Patriot, and did not purport to bind either PHC or Black Beauty.

JA at 132; JA at 67.

The Jobs Monitor declined to rule on one issue raised by PHC and Black

Beauty under the JOBS MOU, which amounts to something of an affirmative

defense. JA at 132. Specifically, he reserved "[t]he question of whether Black

Beauty is exempt from the MOU by virtue of" a grandfather clause applicable to

United Minerals "until the remedy stage of the proceedings." JA at 69. He did so

because the question "presents a factual issue that has not been treated in these

proceedings." *Id.* Assuming PHC and Black Beauty are not exempt, the Jobs

Monitor noted that he would "retain jurisdiction over this matter for the limited

purpose of resolving any remedial issues on which the parties cannot agree." JA at

69.

PHC and Black Beauty responded by filing yet another action in the district

court, seeking to vacate the Award as to their liability under the JOBS MOU. The

11

companies made three claims: first, that the Jobs Monitor erroneously concluded

that their obligations under the JOBS MOU survived early termination of PCC's

2007 NBCWA; second, that the JOBS MOU grants unlawful hiring preferences on

the basis of union membership in violation of §§ 8(b)(1) and (2) of the NLRA; and

third, that as assertedly 'neutral' companies 'unrelated' to PCC as of the spinoff,

the JOBS MOU as interpreted by the JOBS Monitor unlawfully impacts their

business in violation of §§ 8(b)(4) and 8(e) of the NLRA. JA at 138-139; 143; 145.

The district court rejected each of these claims. It affirmed the unreviewability of

the Jobs Monitor's conclusion that PHC and Black Beauty remained bound by the

obligations in the JOBS MOU despite their former affiliate PCC having

subsequently entered into a different agreement on behalf of a different principal.

JA at 139-43. It also found that the JOBS MOU does not impermissibly grant

hiring preferences on the basis of union membership. JA at 143-45. Finally, it

noted the arbitrator's unreviewable finding that PHC and Black Beauty became

parties to the JOBS MOU while under the same corporate banner as PCC and

remained parties after the spinoff to conclude they cannot be considered 'neutral'

for the purpose of invalidating a presumptively valid work preservation agreement.

JA at 145-54. The district court ordered PHC and Black Beauty to arbitrate the

issue of damages before the Jobs Monitor, noting that the Union "does not seek

damages for miners who were hired by PCC at any point after the spinoff, even

though the 2007 MOU did not terminate until December 31, 2011." JA at 154.

PHC and Black Beauty then filed the instant appeal in which they seek review of

the district court's rejection of all three of their claims.

## SUMMARY OF THE ARGUMENT

The district court correctly and concisely observed that "[t]he parties'

opposing views of their post-spinoff obligations form the core of this litigation."

JA at 129. At this late stage, all that remains of this protracted litigation are the

latest inventive iterations of the coal companies' solicitations seeking judicial

second-guessing of a labor arbitration Award compelling their adherence to a

longstanding work preservation agreement to which they remained parties after the

unilateral decision to spinoff of their unionized affiliate. Though a corporate

restructuring severed the link of common ownership between the companies' and

their unionized former affiliate, the arbitrator and district court found that the

spinoff did not and could not sever the companies' contractual commitment to

offer new job opportunities to miners employed or laid-off by their former affiliate

prior to the spinoff.

The Award at issue finds PHC and Black Beauty bound by their pre-spinoff

commitment to offer job opportunities to miners who were laid off by PCC - their

corporate affiliate and co-party to the JOBS MOU - before it was spunoff into

another entity. The district court enforced the Award, finding no merit to the coal

13

companies' three arguments: first, the court declined the companies' request to disturb the Award due to an asserted misinterpretation of their agreement with the UMWA; second, the court rejected the argument that the Award unlawfully entangles the companies in what they characterized as their spunoff affiliate's labor dispute (even though the companies were co-parties to the work preservation commitment at the core of the dispute - not unrelated neutrals); and finally, the court disagreed that the spinoff transformed the companies' longstanding adherence to their contractual work preservation agreement into an unlawful scheme to provide hiring preferences on the basis of union membership. Finding no legal fault justifying its vacature, the court affirmed the Award ordering the companies to comply with their work preservation agreement.

Under the overwhelmingly deferential standard of judicial review of labor arbitration agreements, none of the companies' disagreements with the Award's factual or legal findings – even if they had merit - are grounds to disturb it. And their remaining claim, that the Award violates §§ 8(b)(4) and 8(e) of the NLRA, was properly refuted by the district court's conclusion that no record evidence shows an acquisitive intent to pressure a secondary – neutral, non-party employer – either at the time the JOBS MOU was executed, or even now as the miners seek its enforcement. The record shows an attempt to compel PHC and Black Beauty only to continue to do precisely that which they had always done without protest prior

14

to the spinoff – namely, to honor their promise provide notice of job openings to miners who accrued the benefit of the JOBS MOU by being laid off or threatened with layoff by PCC while that company was the corporate affiliate of PHC and Black Beauty.

The companies' novel theory under §§8(b)(4) and 8(e) appears to be that the spinoff of PCC rendered the JOBS MOU a prohibited agreement to "cease doing business with" another person because it allegedly disrupts Black Beauty's mode of business, including its labor relations and hiring practices. Appellant's Br. at 24. The companies' faithful adherence to the JOBS MOU's terms would have caused these same alleged effects prior to the spinoff of PCC, but they assert that the spinoff has rendered these once benign effects unlawful. In advancing these arguments, the companies obfuscate the true nature of this dispute by refusing to acknowledge that the miners seek only those offers of job opportunities accrued by miners employed or laid-off by PCC prior to the spinoff.

The NLRA protects the right of employees to negotiate collectively over all aspects of their terms and conditions of employment. Protection of employees' job security and preservation of their traditional work has long been deemed a lawful, fundamental purpose of collective bargaining under the NLRA. The UMWA and the BCOA negotiated the JOBS MOU solely for the lawful, primary purpose of protecting unit employees against loss of jobs and income. The JOBS MOU

15

delivers those employment security benefits in a legally permissible manner. *KenAmerican Resources Inc. v. Int'l Union, UMWA*, No. 95-2252, 1996 WL 251859, at *3 (D.D.C. May 8, 1996), rev'd on other grounds, 99 F.3d 1161 (D.C. Cir. 1996) (finding no secondary objective prohibited by § 8(e) in enforcement of the JOBS MOU to require non-union company to offer jobs to employees of its unionized affiliate.)

Congress intended Section 8(e) to prohibit only those measures having a secondary objective, not merely a secondary impact. The Supreme Court has made it clear, in particular, that Congress did not seek to prevent labor and management from protecting the job opportunities and traditional work of union-represented employees. The adverse effects of such protection on other employees and workers, no matter how severe, do not render "work preservation" measures unlawful. Here, the contested job protection and outplacement program provides a direct service to PCC's laid-off and threatened employees, and it does so only to the extent of the control delegated by the nonunion companies to PCC within their corporate family. It does not impose the NBCWA or economic standards on any other employers, does not prohibit or restrict the signatory employer's commercial dealings, and does not grant the Union representational rights or jurisdiction beyond the existing bargaining unit, and its application in this case does not run afoul of § 8(e).

The coal companies in this case nonetheless argue that the JOBS MOU must have a secondary objective because it seeks to preserve work that the signatory employer, PCC, has no "right to control." This argument rests on demonstrably erroneous premises. First, the coal companies argue that their active and knowing decision to enter into to the JOBS MOU as co-parties with PCC should be disregarded in court's § 8(e) "right to control" analysis. The Jobs Monitor found in his Award that the spinoff had no impact on PHC or Black Beauty's right to control the work at issue, which as parties to the JOBS MOU they had agreed to offer to PCC miners in accordance with the terms of that agreement. Moreover, PCC exercised all the control over the work needed to effectuate the JOBS MOU when as limited agent for PHC and Black Beauty it bound them to that agreement for the duration of its term. Second, the companies erroneously contend that PCC lacks the "right to control" performance of work for Section 8(e) purposes unless that company and the affected non-union companies PHC and Black Beauty meet a mechanical application of the National Labor Relations Board ("NLRB")'s "single employer" or "alter ego" tests – that is, unless those entities are so thoroughly integrated that they amount to one and the same employer as a matter of law. The applicable precedent is to the contrary, remaining faithful to the primary/secondary dichotomy at the heart of the analysis and recognizing a "right to control" based

solely on agency, contract or other arm's length business dealings among unaffiliated employers.

Against this showing, the coal companies argue that the allegedly intrusive impact of the JOBS MOU on their non-union operations demonstrates a prohibited secondary objective. That argument, however, ignores the Supreme Court's instructions that even a severe impact on innocent employers and employees does not establish unlawful purpose. Moreover, Section 8(e) was designed to protect only neutral entities from becoming entangled in controversies that do not involve them in any way, and that statutory provision will not bar enforcement of an agreement unless the signatory employer is "wholly unconcerned" in the dispute. The coal companies would have all parties treated as neutral by virtue of their separate incorporation, and because they do not meet the "single employer" or "alter ego" test. Here, the close relationship among PHC, Black Beauty and PCC evident prior to the spinoff in their production of coal for the benefit of PE shareholders and their jointly undertaken commitments in the JOBS MOU itself belie their claim of neutrality. PHC and Black Beauty are plainly not unrelated neutral parties in this dispute over the job opportunity rights accrued by PCC miners.

## STANDARD OF REVIEW

Federal courts will not review labor arbitration awards for mistakes of fact, law or logic. "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Misco, Inc.*, 484 U.S. at 38. A court must "determine only whether the arbitrator did his job - not whether he did it well, correctly, or reasonably, but simply whether he did it." *PPG Indus. Inc. v. Int'l Chem. Workers Union Council of United Food & Commercial Workers*, 587 F.3d 648, 652 (4th Cir. 2009) (quoting *Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Int'l Union,* 76 F.3d 606, 608 (4th Cir.1996)).

Thus, a court will not review an arbitrator's fact-finding or interpretation of a collective bargaining agreement, even in the context of a claim that enforcement of the agreement violates federal labor laws such as Section 8(b) and 8(e) of the NLRA. The court will only determine, *de novo*, whether enforcement of the Award as interpreted by the arbitrator violates federal law. *See Marrowbone Dev. Co. v. Dist. 17, United Mine Workers of Am.*, 147 F.3d 296, 299 (4th Cir. 1998) (noting approvingly in its discussion of the appropriate standard of review that the defendant employer "does not challenge the arbitrator's interpretation of the collective-bargaining agreement itself, it argues that when this interpretation is

19

applied against Marrowbone to reassign work, this application renders the contract unenforceable under § 8(e) of the NLRA.")

## ARGUMENT

### I.  The District Court Properly Declined to Revisit the Facts Found In the Award

It is not the function of the federal courts to weigh the merits of a particular grievance, as to do so would usurp the function of labor arbitration. *Steelworkers Trilogy, i.e., United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564 (1960); *United Steelworkers of America v. American Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 (1960); and *Textile Workers v. Lincoln Mills*, 353 U.S. 448 (1957). *See also United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36 (1987) ("The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements.") The role of the federal courts in reviewing arbitration awards is so narrow that even an arbitrator's *mis*interpretation of the parties' agreement is entitled to judicial deference. *PPG Indus. Inc.*, *supra*.

Notwithstanding the coal companies' argument that the Jobs Monitor interpreted "a labor contract that did not exist," it is beyond serious contention that the Jobs Monitor applied the substantive terms of the JOBS MOU to the facts of the dispute before him. PHC and Black Beauty wanted the Jobs Monitor to

embrace their assertion that a separate July 2011 Jobs MOU in which Heritage

bound Patriot's non-union subsidiaries superseded the 2007 JOBS MOU to which

they became parties. Though superfluous to the legal analysis mandated by the

extremely deferential standard of review, it bears mention in the context of this

assertion that the text of the 2007 JOBS MOU executed by PCC as agent for PHC

and Black Beauty expressly provides: "This MOU constitutes the entire Agreement

between the parties concerning the subject matter discussed in the MOU." JA at

80. The principle thrust of PHC and Black Beauty's claims is that their corporate

divorce from PCC terminated their legal obligations to honor the promises they

made to PCC's miners in the 2007 JOBS MOU, yet they claim Heritage's post-

spinoff execution of a separate 2011 Jobs MOU with its new corporate parent,

Patriot Coal, could terminate those same obligations. The Jobs Monitor's decision

to reject this argument would be unreviewable even if it were not reasonable.

## II. Enforcement of PHC and Black Beauty's Promise to Offer Jobs To Miners Employed and Laid Off By PCC Before the Spinoff Does Not Violate the NLRA

This appeal asks the Court to decide whether Section 8(e) of the NLRA bars

an employer-union agreement with one purpose, one object and one effect – to

give the unionized employer's employees some measure of job security in a

notoriously cyclical industry. As the Supreme Court has long recognized, "no

problems in the domestic economy are of greater concern than those involving job

security and employment stability. Because of the potentially cruel impact upon the lives and fortunes of the working men and women of the Nation, these problems have engaged the solicitous attention of government, of responsible private business, and particularly of organized labor." *National Woodwork Manufacturers Assn. v. NLRB*, 386 U.S. 612, 640 (1967) (quoting *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 223 (1964) (Stewart, J. concurring). The NLRA declares it the policy of the United States to meet those concerns by "encouraging the practice and procedure of collective bargaining," and by assuring employees' associational and representational rights "for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 29 U.S.C. § 151.

Given that paramount national policy, and based on detailed review of the pertinent statutory language and legislative history, the Supreme Court has concluded that Congress designed Section 8(e) to remedy the specific evil identified as "hot cargo" agreements, or voluntary "secondary boycotts". *National Woodwork*, 386 U.S. at 620-635; *NLRB v. Int'l Longshoremen's Assn. ("ILA I")*, 447 U.S. 490, 504 (1980). A hot cargo agreement – like other forms of secondary activity – aims at solving the union's primary dispute with another person and conscripts a wholly uninvolved, neutral employer as a mean's of furthering the union's goal. Section 8(e), therefore, condemns only agreements having such

22

"secondary objectives," the Court emphasized, for Congress "stopped short of proscribing identical activity having the object of pressuring the employer for agreements regulating relations between him and his own employees." *National Woodwork*, 386 U.S. at 620 (emphasis added.)

As is only to be expected given the intense employee concern with job security, collective bargaining provisions that protect employees against job loss have long been a staple of lawful, primary employer-union agreements. As the Supreme Court has made clear on more than one occasion, "Congress in enacting 8(e) had no thought of prohibiting agreements directed to work preservation." *NLRB v. Int'l Longshoremen's Assn. ("ILA II")*, 473 U.S 61, 74 (1985) (citations omitted).

The JOBS MOU negotiated between the UMWA and BCOA is just such a provision. In conjunction with Article II of the NBCWA, the MOU represents a specially tailored combination of employee benefit and work preservation features that matches displaced or threatened bargaining unit miners with available non-union mining jobs at affiliated non-union employers. The MOU thus preserves work opportunities for the employees of each signatory employer, not for "the Union" in general. Its benefits are more modest, and its impact less severe, than the classic work preservation measures upheld against § 8(e) challenge – most notably those that prohibit or limit contracting out, erect a barrier against competing

23

processes, bring work into the contractual bargaining unit, or impose the union contract terms or standards on work through other firms.

Enforcement of the JOBS MOU in this matter is sought to address job security by providing bargaining unit miners direct relief in the form of promised job offers from non-union companies that were in the PCC corporate family at the time the miners were laid off or threatened with unemployment.

### A. The JOBS MOU was entered into and is now being enforced for the lawful purpose of preserving work to miners who worked in the UMWA bargaining unit

Section 8(e), as noted above, addresses agreements that have a secondary purpose and "does not prohibit agreements made for 'primary' purposes…" *NLRB v. Pipefitters Local 638*, 429 U.S. 507, 517 (1977). To determine whether a challenged agreement is primary, the courts examine "whether the agreement or its maintenance is addressed to the labor relations of the contracting employer-vis-à-vis his own employees." *ILA I*, 447 U.S. at 504; *National Woodowork*, 386 U.S. at 644-45. The primary purpose of most provisions dealing with the covered employees' wages, benefits, and other working conditions is self-evident. Agreements of this kind affect the relationship between the employer and its

employees and do so in a way that has little to no effect on the employer's relationships with other employers.

More complex products of labor-management cooperation, however, can demand "an inferential and fact-based" inquiry requiring "the drawing of lines 'more nice than obvious.'" *ILA II*, 473 U.S. at 81 (citation omitted). That is because such agreements have both a direct and immediate effect on the employer's relationships with its employees, and an effect on the employer's business relations with other employers. In such cases, the courts' inquiry starts with the recognition that the "primary purposes protected by the Act" include "the purpose of preserving for the contracting employees themselves work traditionally done by them." *ILA I*, 447 U.S. at 504, quoting from *Pipefitters*, 429 U.S. at 517.

When a disputed agreement appears to have a "work preservation" objective, the Supreme Court has endorsed two analytical tools – the "fairly claimable" and "right to control" inquiries – that can help to confirm or refute the claim of an unlawful purpose. A protective agreement plainly withstands challenge if it seeks the "preservation of work traditionally performed by employees represented by the union," *ILA I*, 447 U.S. at 504, and if the signatory employer "is in position to deliver" that work. *Pipefitters*, 429 U.S. at 525. Evaluation of those factors must focus solely on "the work of the bargaining unit employees, not on the work of other employees who may be doing the same or similar work." *ILA I*, 447 U.S. at

25

508. The "extra-unit effects" that an agreement meeting those tests has on other

employer or unrepresented workers, no matter how severe, *are irrelevant to the*

*analysis.*" *ILA II*, 473 U.S. at 79, quoting from *ILA I*, 447 U.S. 507, n.22 (emphasis

supplied); *National Woodwork*, 386 U.S. at 627 ("however severe the impact of

primary activity on neutral employers, it was not thereby transformed into activity

with a secondary objective").

Application of the *ILA* principles here confirms the JOBS MOU's lawful,

primary objective of protecting unit employees' job security:

1. As noted above, the JOBS MOU provides PCC's employees a direct, in-

kind job benefit akin to severance pay or outplacement services. The one

innovative feature of the JOBS program is that the employer makes a commitment

– as a limited agent of other members of its corporate family – to provide job

opportunities to laid-off employees of the signatory employer. Evaluation of the

parties' objective in this case, therefore, should first consider the obviously

primary purpose of seeking that form of job protection.

2. The UMWA negotiated the JOBS MOU on a broad national basis,

against a background of undeniable threats to miners' job security throughout the

country brought about by the progressive depletion of coal resources,

environmental regulation, changing technologies and economic conditions.

26

Ultimately, the coal companies themselves determine how these conditions will affect represented workers. They give, restrict, or withhold work opportunities by, for example, choosing when and where to produce coal, deciding whether to work under the name of a signatory employer or through a separately incorporated firm, trading lands and mining rights, contracting work to other firms, purchasing rather than mining coal, and selling operations and other assets, at any given time. As long as signatory operators continue in the business of producing coal, miners working under the NBCWA have the ability to perform their traditional functions to meet the signatories' manpower needs. If and when coal operators form related, non-signatory corporations and position those firms to take on business that could otherwise have been accomplished through signatory firms, that practice undermines the employee-miners' job security.

In those conditions, the miners' legitimate desire "to preserve work in the face of [such] a threat to jobs" manifests a "clear primary objective." *ILA II*, 473 U.S. at 79. *Accord, Becker Electric v. IBEW Local 212*, 927 F.2d 895 (6th Cir. 1991) (unions feared that existence of affiliated non-union firms would diminish job opportunities). The Jobs Monitor found as a matter of fact entitled to judicial deference that "[t]he purpose of the MOU is not, however, limited to preventing the assignment of future work away from signatory employers, but also to provide the employees of signatory employers with job opportunities in work currently

27

being performed at nonsignatories." JA at 61. The JOBS MOU does not present the legally problematic case of workers seeking "to acquire new job tasks *when their own jobs are not threatened.*" *ILA II*, 473 U.S. at 76 (emphasis in original). On the contrary, the represented miners here seek only to continue performing their traditional job tasks and to protect against unemployment. Such an "agreement bargained for with the objective of work preservation in the face of a genuine job threat... is not 'acquisitive'" and does not evidence a secondary objective despite its effects elsewhere. *ILA II*, 473 U.S. at 79, n.19.

3. The JOBS MOU is a benign method of providing collectively bargained job protection, as compared to stronger forms of work preservation deemed primary and lawful under the Act. No-subcontracting clauses, for example, may completely preclude commercial dealings and deny work opportunities to non-union employees. A lawful primary agreement may preserve job opportunities by forbidding the signatory from contracting out work unless the subcontractor hires laid-off unit employees. *Mine Workers District 31 v. NLRB*, 879 F.2d 939 (D.C. Cir. 1989). "Union standards" clauses may require a firm to match the union employees' economic standards in order to do business with the signatory, and may further subject the non-signatory firm to arbitration over non-compliance with union standards. *Teamsters Local 386 (Construction Material Trucking)*, 198 NLRB 1038 (1972) and *Teamsters Local 216 (Bigge Drayage)*, 198 NLRB 1046

28

(1972), aff'd 520 F.2d 172 (D.C. Cir. 1975). And anti-double-breasting measures may require application of the union contract terms to work that the signatory employer actually performs through another firm it manages or controls. *Becker Electric v. IBEW Local 212*, *supra*. Recognizing that allocation of work falls within the scope of bargaining over terms and conditions of employment, *Road Sprinkler Fitters Union 669 v. NLRB*, 789 F.2d 9, 12-13 (D.C. Cir. 1986), the UMWA and BCOA could have negotiated to halt or limit the establishment of non-signatory coal mining operations. *ILA I*, 447 U.S. at 505 (one way to protect jobs is "simply to insist that the innovation not be adopted.")

In contrast, the UMWA and BCOA fashioned a JOBS MOU that focuses single-mindedly on protecting individual bargaining unit employees. And it grants such protection without imposing any of the economic burdens or the spread of union influence associated with more traditional forms of work preservation. The JOBS MOU does not dictate the hiring firms' labor relations with their own employees. It does not impose a UMWA collective bargaining agreement. It does not obligate the hiring firm to recognize or bargain with the UMWA with respect to any of its employees. It provides no tenure or privileges for bargaining unit miners hired pursuant to the MOU, and it sets no minimum standards. Rather, it leaves wages, hours and working conditions entirely to the non-signatory firms' unilateral will and discretion. At best, the JOBS MOU gives unit employees job

29

protection reduced to the barest minimum: nothing more than a non-union job in a non-union company. The Union gains no institutional benefit, aside from the satisfaction of helping individual miners off the unemployment roles.

The MOU, moreover, makes more modest economic demands on the signatory employer than would alternative means of protecting employees. For example, guaranteeing "lifetime" jobs, paying long-term compensation for the duration of unemployment, or subsidizing ever displaced workers' retraining, may have a much more severe impact than the obligation to secure preferential hiring offers within the enterprise.

In sum, while responding to traditional threats and job security needs, the parties to the JOBS MOU constructed a remedy for job insecurity that has lesser effects on signatory and non-signatory parties than federal law permits. Their forbearance and innovation is no way undercut their lawful primary purpose, for the protection that Congress afforded to bargaining for job security "cannot be limited solely to employees who respond to change with intransigence." *ILA I*, 447 U.S. at 506 ("Congress, in enacting § 8(e), did not intend to protect only certain kinds of work preservation agreements.") Agreements that "attempt to 'accommodate change' while still preserving some type of work for union members" have no less legitimacy than those that seek to "block progress" entirely. *ILA II*, 473 U.S. at 77.

    4.  PHC and Black Beauty assert that "[r]ather than protecting the job security of bargaining unit employees, the Jobs MOU, as applied, unlawfully facilitates organizational objectives beyond the unit." Appellants Br. at 39. This accusation is not supported by record evidence of any operation having been organized by miners placed through the JOBS MOU or even a single attempt by such miners to secure the union's recognition via an NLRB election. Indeed, the Jobs Monitor expressly found as a matter of unreviewable fact that "there is no evidence in this case that the Union sought to affect employment relations at Black Beauty or its contractors (e.g. by encouraging those employers to recognize and bargain with the Union or encouraging the employees of those employers to join the Union)…" JA at 63. Links to YouTube clips and selected quotations from biased industry journals submitted for the first time in an appellate brief do not cure this deficiency. Even if the accusation were supported, the Union could not render an otherwise lawful work preservation program unlawful under §8(e) simply by advocating the exercise of miners' rights under §7 of the NLRA. The coal companies equate the mere possibility of individual miners' voluntary jobsite organizing, leading to an NLRB representation election, with the imposition of a top-down union contract on unconsenting neutral employers and employees. *See Linden Lumber Co. v. NLRB*, 419 U.S. 301 (1974)(employer has no duty either to

grant union recognition or seek an NLRB election, no matter how extensive the union's support among his employees).

As the Supreme Court has emphasized, an employee's undertaking to engage in ordinary on-the-job organizing activity is "specifically protected by the Act", and an employer "has no legal right to require that, as part of his or her service to the company, a worker refrain from engaging in protected activity. *Town and Country Electric v. NLRB*, 516 U.S. 85 (1995). The very suggestion that encouraging employees to exercise their Section 7 rights inexorably taints the JOBS MOU, and permanently bars those miners' contractual rights to job placement, offends the core tenets of the NLRA. Indeed, any evidence the UMWA has appealed to its miners to organize confirms that the Union gains no inherent extra-unit power or jurisdiction by virtue of the JOBS MOU, but, rather, must implore individual employees to organize each new workplace from the ground up. Such appeals provide one of the clearest refutations of alleged secondary objectives.

5. The Appellant coal companies imply that the JOBS MOU fails to protect fairly claimable work because PCC is based in Kentucky and their operations at which the job opportunities at issue may be based are in the neighboring state of Indiana. Not only does this argument under-appreciate the dire effects of unemployment on experienced, often older miners and their corresponding

willingness to relocate for increasingly fewer job opportunities, it also conflicts

with the holding in the ILA cases that employees seeking job protection are not

confined to negotiating provisions enabling them only to do the same work, in the

same place, in the same manner, as the unit employees have done in the past. *See*

*ILA II*, 473 U.S. at 71 (shortstopping work fairly claimable even though

independent of longshore cargo handling and "assumed for different purposes");

*California Cartage v. NLRB*, 822 F.2d 1203, 1207 (D.C. Cir. 1987) (agreement is

primary if aimed at "work traditionally done by unit employees… or the functional

equivalent of that work").

A proper focus on the work traditionally performed by miners in the PCC

bargaining unit confirms that they have preserved no more than the law allows.

The JOBS MOU provides job opportunities only to the extent the Appellant coal

companies require "classified" work, that is, coal mining work traditionally done

by miners under the collective bargaining agreement. Further, the MOU grants

preferential hiring rights only to displaced or threatened miners who have the

qualifications and skills to step in and perform the work without training or delay.

The present action, therefore, is plainly "not a case in which an avowed work

preservation agreement 'seeks to claim work so different from that traditionally

performed by the bargaining unit employees that a secondary objective might be

inferred." *ILA II*, 473 U.S. at 81, quoting *American Trucking Ass'n, Inc. v. NLRB*, 734 F.2d 966, 980 (4th Cir. 1984).

6. PHC and Black Beauty twice assert that the Union's as-applied enforcement of the MOU has the post-Spinoff effect of pressuring the primary employer, Heritage Coal, to "make its employees available" to a competitor of its parent, Patriot. Appellant's Br. at 10, 24. As an initial matter, it is not readily apparent what it means to assert that Heritage (formerly PCC) is pressured to "make its employees available." Heritage has absolutely no role to play in the decision of any miner who by virtue of the Award in this case may, upon compliance, receive from PHC or Black Beauty an offer of a job opportunity that miner earned by working for PCC prior to the spinoff. It cannot be said that Heritage has some property or other legally cognizable right to the continued employment of any one of its miners, all of whom are always free to take job opportunities elsewhere, whether by operation of the JOBS MOU or opportunities presented in a free labor market.

Even if, arguendo, the idea that Heritage must "make its employees available" had any legally cognizable meaning in the context of our free labor market, it is not germane to this case as the impact of a work preservation provision on the primary signatory employer is not a part of the § 8(e) analysis. Heritage has not filed or joined any cause of action under Section 8(e) before any

court or the NLRB, is not a party to the arbitration decision at issue in this case, was not a party to the proceedings before the District Court, and neither the Award nor the District Court's order require Heritage Coal to do anything at all. This case is and always has been about rights to job opportunities at PHC and Black Beauty that miners accrued while they were employed by PCC before the spinoff - during the time the three companies were corporate affiliates. Moreover, Heritage – the very same entity that executed the 2007 JOBS MOU on behalf of itself as PCC and as limited agent of PHC and its non-signatory subsidiaries - was axiomatically aware of the JOBS MOU commitments undertaken prior to the spinoff. The district court rejected the baffling suggestion that §8(e) or 8(b)(4) must be invoked to prevent Heritage from suffering inequity if it must "make its employees available" in response to job offers from its former affiliates pursuant to its own pre-spinoff commitments.

7.  PHC and Black Beauty argue that as a result of the spinoff, the signatory employer, PCC, lacks the requisite "right to control" their hiring practices. Appellant's Br. at 15. In furtherance of this argument, they assert that PCC, PHC and Black Beauty do not share an "alter ego, single employer, or joint employer relationship that might provide a basis in law for collapsing the corporate separateness of legally distinct employers, and thereby support a determination that the signatory Employer constructively controlled the nonsignatory Companies'

35

hiring practices." [4]  Appellant's Br. at 19. This argument misconceives the nature and purpose of the "right to control" as a factor in the §8(e) primary/secondary dichotomy.

Control for the purposes of §8(e) has never required a showing of "single employer" status. Rather, the existence of control – that is, being in a position to "deliver" or allocate work – is perfectly compatible with the fact that control is exercised in arm's length business dealings between wholly unrelated parties. *See National Woodwork* and *Pipefitters* (signatory employer's control or lack of control over work derives from delegation or reservation by clearly neutral third parties such as owners, architects and general contractors). Thus a signatory employer can have the "right to control" without having any role in the labor relations, the management, or any other aspect of the firms with which the signatory employer deals. At the same time, close relationships among admittedly separate entities may give the signatory employer the ability to deliver work despite the absence of written contracts, specifications or other "formal indicia of control." *California Cartage v. NLRB*, 822 F.2d at 1210 (based on dealings

---

[4] It bears emphasis that a forthright discussion of this issue must include an acknowledgment that enforcement has only been sought and granted for those job opportunity rights that miners accrued prior to the spinoff by virtue of employment or layoff from PCC prior to PE's spinoff of PCC to Patriot – a point Appellants' brief fails to note despite lengthy argument suggesting (erroneously) that common ownership is critical to a "right to control" finding.

between employer association and non member steamship companies, "it may well be, then, that PMA does indeed have some control over non-PMA members' assignment of work, or that those steamship companies in fact have some control over PMA itself, or both").

Here, the disputed JOBS MOU relies on agency, delegation and other "formal indicia of control." PHC's ownership of the signatory PCC and non-signatory companies, including Black Beauty, gave PHC functional control over work allocation among the companies, regardless of whether managers of PHC personally conducted each subsidiary firm's day-to-day affairs.

The very fact that PCC secured the agreement of PHC to act as limited agent for PHC and its non-union subsidiaries to bind it to the JOBS MOU for its duration is clear evidence that PCC secured a right to control the work assignments at issue. PCC's exercise of that limited agency authority to bind PHC and its non-union subsidiaries to an agreement to offer jobs to its laid of miners, without more, was an exercise by PCC of the right of control and a delegation by PHC of the authority to control the work in dispute. Once PCC bound PHC and its non-union subsidiaries, PCC functionally exercised all the control over the assignment of work necessary to effectuate the promises made in the JOBS MOU for the duration of its term. There was nothing more PCC needed to do to control PHC and its non-union subsidaries' hiring practices through expiration of the JOBS MOU. This is

37

the conclusion the Jobs Monitor reached, where he found as a matter of unreviewable fact that "there can be little doubt that PHC and Black Beauty, the employers who are party to the MOU by virtue of the limited agency granted to PCC to bind them to the MOU, have the power to control the work being sought." JA at 63.

### B. As co-parties to the JOBS MOU both before and after the spinoff of PCC, its former parent and affiliate are not neutral unrelated employers

The foregoing showing of the JOBS MOU's primary character is dispositive. But that agreement is all the more binding here because, as the district court held, neither PHC nor its non-union subsidiaries, including Black Beauty, is a neutral employer for the purposes of §8(e).

The "central theme" of Sections 8(b)(4)(B) and 8(e) of the NLRA is "the protection of neutrals against secondary pressure." *National Woodwork*, 386 U.S. at 637. Neutrality for purposes of these "secondary boycott" and "hot cargo" provisions does not follow automatically from separate incorporation or from legal status as a distinct NLRA "employer" or "person". Rather, "Congress intended Section 8(b)(4) to protect only neutral parties – and not even all neutrals – from coercion in disputes not their own." *Production Workers Union, Local 707 v. NLRB*, 793 F.2d 323, 329 (D.C. Cir. 1986). Indeed, "the interrelationship between

employers can be so close that neither can be regarded as a 'neutral' or secondary employer." *California Cartage* Co., 822 F.2d at 1210. In particular, neither Section 8(e) nor 8(b)(4)(B) can apply "where the secondary employer against which the pressure is directed has entangled himself in the vortex of the primary dispute." *National Woodwork*, 386 U.S. at 637.

As Senator Taft emphasized in explaining the secondary boycott provisions:

> This provision [Section 8(b)(4)(B)] makes it unlawful to resort to a secondary boycott to injure the business of a third person who is ***wholly unconcerned*** in the disagreement between an employer and his employees.

93 Cong. Rec. 4198 (1947)(emphasis supplied). And:

> The secondary boycott ban is merely intended to prevent a union from injuring a third person who is ***not involved in any way*** in the dispute or strike...

95 Cong. Rec. 870 (1947)(emphasis supplied). *See e.g., Int'l Longshoremen's Ass'n. v. Allied Int'l, Inc.*, 456 U.S. 212, 225 (1982)(defining protected neutrals as "the helpless victims of quarrels that do not concern them at all"). In a decision authored by now Justice Ginsberg and joined by now Justice Scalia, the D.C. Circuit accordingly found "the intent of Congress on this issue, as described by definitive, repeated, and unambiguous Supreme Court precedent, altogether clear: Section 8(b)(4) was designed to prohibit only pressure brought to bear on a 'third person who is wholly unconcerned in the disagreement, whether that pressure is called a 'secondary boycott' or 'secondary activity'." *Production Workers v.*

39

*NLRB*, 793 F.2d at 328 (citations omitted). *Accord, Chipman Freight Svcs., Inc. v. NLRB*, 843 F.2d 1224 (9th Cir. 1988), cert. Denied, 488 U.S. 848 (1988). With these principles in view, the Supreme Court has cautioned against "mechanical application" of the right to control test. *NLRB v. Enter. Ass'n of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Mach. & Gen. Pipefitters of N.Y. & Vicinity, Local Union No. 638*, 429 U.S. 507, 521 n.8 (1977).

The Appellant coal companies would ignore those teachings by treating all corporate parties as automatically neutral with respect to each other unless they meet a mechanical application of the NLRB's "single employer" or "alter ego" test. The precedents cited demonstrate the coal companies are wrong.

Prior to the spinoff of PCC, which is the only time period in this case relevant to both the promise and accrual of the job opportunities at issue, PE was the corporate parent of its wholly owned subsidiary PHC, which was a party to the JOBS MOU and in turn was a parent to its wholly owned subsidiary parties to the JOBS MOU: PCC, Black Beauty, and all of PHC's other non-union subsidiaries. JA 84. It is beyond any realistic doubt that these employer parties to the JOBS MOU shared a unity of purpose and common design at the time they executed that agreement. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984) (holding a parent corporation and its subsidiary are incapable of conspiring with each other under Section 1 of the Sherman Anti-trust Act, because "in reality

40

a parent and a wholly owned subsidiary *always* have a ' unity of purpose or a common design.'") (emphasis supplied).[5] This common-sense holding alone, in light of PHC, Black Beauty and PCC's continued status as co-parties to the JOBS MOU through its termination date, is sufficient to defeat any assertion by the Appellant coal companies that their corporate divorce from PCC makes them "not involved in any way" with the miners' claims to the job opportunities now in dispute.

This same "unity of purpose" and "common design" between the coal company parties to the JOBS MOU and their corporate parent informed the district court's decision that PHC and Black Beauty cannot now rely on PE's "calculated and unilateral step of initiating the spinoff" of PCC to claim the neutrality entitling them to refuse to provide the hiring preferences they promised the miners. JA at 152-53. The court correctly observed that to permit this would "undermine the bargained for protections of a valid work preservation agreement." JA at 153. In the face of an employer's claim that it lacks control necessary to honor its commitments to its workers, courts do not turn a blind eye to how the employer

---

[5] Indeed, PHC and Black Beauty admit that "from February 1999 through October 2007 [the spinoff date], Peabody Coal had the ability to control Black Beauty work, through their common parent, and Black Beauty acceded to the UMWA's hiring pressures during this interregnum of common control." Appellant's Br. at 29-30.

came to be in that situation. Thus, the district court properly refused to grant PHC
and Black Beauty neutral status, which would have left PCC's miners – the very
same miners that PHC and Black Beauty had been providing notice of job
opportunities before the spinoff - without the employment security they were
promised.

### C. The JOBS MOU does not discriminate on the basis of union membership

PHC and Black Beauty reassert the claim rejected by the district court that
enforcement of the JOBS MOU would require them to offer jobs to PCC miners
solely on the basis of the latter's union membership, in violation of §§ 8(b)(1)(A)
and (b)(2) of the NLRA, which generally make it unlawful for employers to grant
hiring preferences on such a basis. JA at 143. The court correctly observed that the
JOBS MOU explicitly prohibits such discrimination, which is "fully consistent
with the ultimate objective of the agreement, which is not merely to reward union
membership, but to provide the nonsignatory mining companies with access to an
experienced pool of miners." JA at 144. The court noted that jobs offered pursuant
to the JOBS MOU are granted on the basis of seniority achieved through work
with PCC, which accrues to individual miners irrespective of their status with the
Union. *Id*. Moreover, miners lose union representation when placed with a non-
union company. *Id*. The court noted PHC and Black Beauty's failure to cite any

42

law supporting their position, which is undercut by the holding in *Courier-Citizen Co. v. Boston Electrotypers Union No. 11, Int'l Printing & Graphic Commc'ns Union of N. Am.*, 702 F.2d 273, 278 (1ˢᵗ Cir. 1983).

On appeal, the coal companies quote from the "union security" language in Article I of the NBCWA to support an assertion that the miners PHC/Black Beauty are required by the Award to offer job opportunities "gained the hiring preference solely by virtue of their status as UMWA members who work (or worked) under a UMWA labor contract(s)." JA at 44-45. They allege coverage by the NBCWA automatically requires a miner to become and remain a union member. This is simply untrue and has not been true at any time the JOBS MOU has been in existence. A union security clause in a collective bargaining agreement cannot compel union membership. In *NLRB v. General Motors Corp.*, the Supreme Court held that membership pursuant to a union security provision like the one in Article I of NBCWA is limited to its "financial core," meaning that the only thing a union can require of the workers it represents is the payment of union dues and initiation fees. 373 U.S. 734 (1963). No other obligations of membership in good standing can be imposed. In *Pattern Makers' League v. NLRB*, the Court held that any union member in good standing could resign membership at any time for any purpose without giving any notice and remain a represented worker. 473 US 95 (1985).

43

If it were true, as the coal companies claim, that the pool of miners with accrued job opportunity rights in this case "gained the hiring preference *solely* by virtue of their status as UMWA members who work (or worked) under a UMWA labor contract(s)," the claimant pool would be comprised of the thousands of UMWA miners around the country who work for a variety of signatory employers under the terms of the NBCWA. In reality, the pool of claimants is limited to those who worked for PCC during the term of the JOBS MOU, but prior to the spinoff and such miners have a claim regardless of whether they were members of the UMWA or not.

Respectfully submitted,

_/s/ Arthur R. Traynor_

Arthur R. Traynor
*Associate General Counsel*
UNITED MINE WORKERS OF AMERICA
18354 Quantico Gateway Drive
Triangle, Virginia 22172
Ph: (703) 291-2400
Fax: (703) 291-2448
*Counsel for Appellee*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[XX ] this brief contains 10,179 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

[     ] this brief uses a monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because:

[XX ]this brief has been prepared in a proportionally spaced typeface using 14-point type, and the word processing system of Microsoft Word 2010; or

[     ] this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

Dated:  April 23, 2015

            /s/ Arthur R. Traynor_____
            Arthur R. Traynor
            *Counsel for Appellee*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of April, 2015, I caused the foregoing

Brief of Apellee, United Mine Workers of America, International Union to be filed

electronically with the Clerk of the Court using the CM/ECF System, which will

send notice of such filing to the following registered ECF users:

> John R. Woodrum
> W. Gregory Mott
> Zachary Steven Stinson
> OGLETREE, DEAKINS, NASH
> SMOAK & STEWART, P.C.
> 1909 K Street, Suite 1000
> Washington, D.C. 20006
>
> *Counsel for Appellants,*
> *Peabody Holding Company, LLC &*
> *Black Beauty Coal Company, LLC*

I further certify that on this 23rd day of April, 2015, I have by U.S. Mail

delivered the required number of bound copies of the foregoing Brief to the Clerk

of the Court and to Counsel for Appellants at the above-address.

> ___/s/ Arthur R. Traynor_____
> Arthur R. Traynor
> *Counsel for Appellee*